[No. 56111-7. En Banc. March 15, 1990.]

PRESBYTERY OF SEATTLE, *Petitioner,* v. KING COUNTY, *Respondent.*

322

*Montgomery, Purdue, Blankinship & Austin,* by *John D. Blankinship* and *Gale D. Barbee,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Ann Schindler, Senior Deputy,* for respondent.

ANDERSEN, J.—

FACTS OF CASE

A well respected commentator on land use law, Professor Richard L. Settle of the University of Puget Sound Law School, recently wrote that "[r]egulatory taking doctrine is the most perplexing area of American land use law."[1] By our opinion herein, we deal with that subject, elaborate upon our opinion in *Orion Corp. v. State,* 109 Wn.2d 621, 747 P.2d 1062 (1987), *cert. denied,* 486 U.S. 1022, 100 L. Ed. 2d 227, 108 S. Ct. 1996 (1988), and clarify this court's recent opinion in *Allingham v. Seattle,* 109 Wn.2d 947, 749 P.2d 160 (1988).

In this case, the owner of property containing wetlands appeals the dismissal of its inverse condemnation[2] action based upon the owner's failure to exhaust its administrative remedies.

In 1978 the Presbytery of Seattle purchased a single family home located on approximately 4.5 acres of land in Federal Way for $60,000. The financing documents indicate the property was purchased for the construction of a church.

In 1979 the Presbytery informed the Federal Way Planning and Development Commission that in 1980 it intended

---

[1]Settle, *Regulatory Taking Doctrine in Washington: Now You See It, Now You Don't,* 12 U. Puget Sound L. Rev. 339 (1989).

[2]This court has defined inverse condemnation as an "action brought against a governmental entity having the power of eminent domain to recover the value of property which has been appropriated in fact, but with no formal exercise of the power." *Martin v. Port of Seattle,* 64 Wn.2d 309, 310 n.1, 391 P.2d 540, *cert. denied,* 379 U.S. 989, 13 L. Ed. 2d 610, 85 S. Ct. 701 (1964).

to begin construction of a church. However, for financial reasons, that building plan fell through. The Presbytery continued to rent out the existing home located on the property and has never filed an application for a development permit for the property.

Part of the Presbytery's property contains a "wetland".[3] King County's wetland planner submitted an affidavit which stated that prior to the enactment of the 1986 ordinance, which is here challenged, both the State Environmental Policy Act of 1971 (SEPA)[4] and King County's Sensitive Area Ordinance[5] would have been applied to any development application since wetlands are protected by both acts. The record before us indicates that in 1981 King County conducted an inventory of wetlands and concluded that the wetlands involved in this case, Hylebos Wetland No. 18, was a "class 1" wetland.[6] The County provided affidavits to show that this wetland is in excess of 12,000 years old, is one of the last major wetlands in the Federal Way

---

[3]By affidavit, King County's wetland planner explained as follows. A wetland is a swamp, marsh or bog that supports vegetation typically adapted for life in saturated soil conditions. The ecosystem and habitat value of wetlands is reflected by the diversity of the vegetation and wildlife present in the wetland. The more diverse the vegetation, the more complex the wetland. Complex wetland systems provide places of refuge commonly referred to as "niches". These niches serve as mating, breeding and nesting sites as well as locations for spawning. Wetland areas are also the primary habitat for all waterfowl including ducks, geese and shorebirds. Other forms of wildlife, such as fish, mink, coyote, raccoon, and amphibians also rely on the wetlands for their survival. Salmon often spawn in the marshy channels of a wetland and the wetland provides seasonal recharge to streams which are critical for the survival of fisheries. If the wetland area is diminished or disturbed, the ecosystem becomes critically unbalanced and environmental impacts are significant. Niches are destroyed and the wildlife habitat is eliminated or significantly reduced.

[4]RCW 43.21C.

[5]King County Code 21.54.

[6]The County's wetland planner stated that wetlands are rated No. 1 if there is a presence of species recognized by the federal government as rare, endangered or threatened and the wetland is a sensitive or outstanding potential habitat for such species.

area and is of major environmental significance to King County. It also contains one of the few old growth cedar bogs still in existence in the Pacific Northwest. For purposes of this appeal, the parties concur that Wetland No. 18 comprises approximately one–third of the Presbytery's property.[7]

In 1986 the County enacted ordinance 7746 (hereafter the 1986 Wetland Ordinance). The ordinance includes prohibitions on creation of new construction within the wetland boundaries and creates a buffer zone around the wetland (which may be increased if endangered species exist within the buffer) and a native growth protection easement. It is the Presbytery's argument that the ordinance prohibits the development of a substantial portion of its property and thereby effects a taking of property without just compensation. The Presbytery's inverse condemnation action alleges that the County's wetland regulations prevent it from using its land for a church or for any other economically reasonable or profitable use.

At the request of the Presbytery's attorney, a consultant studied the impact of the regulations on the property. He noted the property is zoned S–E–P which usually allows 1.2 dwelling units per acre. He drew a map of a subdivision containing five lots of the required size. He then concluded that three or possibly four of the five lots are destroyed for any use other than open space by the 1986 Wetland Ordinance.

The manager of the County's Building and Land Development Division responded that this consultant's opinion was based on the erroneous assumption that the entire parcel of property consisted of dry, buildable land. The County further stated that such a subdivision could violate not only the 1986 Wetland Ordinance, but also SEPA and

---

[7]We note that the Presbytery originally alleged that the wetlands comprised a larger percentage of its property than one–third, but apparently because they are seeking summary judgment, are now relying on the County's estimate of one–third. The County explains that the wetland boundary has not yet been established because the current mapping is only an approximation.

King County's Sensitive Area Ordinance. The County declares that although no application has as yet been made for the construction of a church, pursuant to the zoning code a church and parking lot could potentially be built on the property.

Both parties moved for summary judgment. The County moved to dismiss on the grounds that the Presbytery had never applied for a building permit and, therefore, had failed to exhaust its administrative remedies. The County argued that it would not be futile to require exhaustion because the property could still be used for building a church, the purpose for which it had been purchased. The County also noted that its Sensitive Area Ordinance allowed for development of wetlands if application of the wetland ordinance "would deny all reasonable uses of a property".[8]

The trial court granted the County's motion to dismiss based on the landowner's failure to exhaust its administrative remedies. The Court of Appeals affirmed in an unpublished opinion.[9] We herein consider the two issues we have determined to be dispositive and affirm both the Superior Court and the Court of Appeals.

ISSUES

ISSUE ONE. Does a land use regulation which prohibits development of a portion of an undivided parcel of property constitute a "taking" of the portion which must remain undeveloped?

ISSUE TWO. Did the Superior Court and the Court of Appeals correctly apply the exhaustion doctrine to the Presbytery's inverse condemnation action?

---

[8]King County Code 21.54.170(B) (part).

[9]*Presbytery of Seattle v. King Cy.*, 53 Wn. App. 1074 (1989).

## DECISION

PREFATORY NOTE. The issues presented in this case are interrelated and cannot be analyzed as separate and distinct inquiries. It is impossible to analyze the exhaustion doctrine and its futility exception without first having a clear understanding of the tests to be utilized for regulatory takings and substantive due process violations. In considering factual futility, it is necessary to determine whether the governmental body can provide a solution to the land use problem which would avoid the conclusion of an unconstitutional taking or a due process violation. Any case which considers the futility exception to the exhaustion requirement must view it in the context of the constitutional definition of a regulatory "taking". Therefore, this opinion commences with a consideration of recent state and federal case law regarding constitutional limitations on land use regulations.

ISSUE ONE.

CONCLUSION. A land use regulation which prohibits development of one portion of an undivided parcel of property does not necessarily constitute a "taking" of the portion which must remain undeveloped. Mere regulation on the use of land has never constituted a "taking" or a violation of due process under federal or state law. The problem in any given case is to determine when such a regulation exceeds constitutional bounds. In order to determine whether such a regulation would be unconstitutional either as a "taking" or as a violation of substantive due process, it is necessary to follow the proper tests for inverse condemnation and for substantive due process violations due to excessive land use regulation.

The United States Constitution, U.S. Const. amend. 5, provides in relevant part,

> nor shall private property be taken for public use, without just compensation.

The Constitution of the State of Washington, Const. art. 1, § 16, provides in pertinent part:

> No private property shall be taken or damaged for public or private use without just compensation having been first made . . . [10]

The "tests" for over–regulation have until recently proved somewhat of a quagmire of constitutional theory vacillating between substantive due process and "takings" theory. Both this court and the United States Supreme Court have in the past struggled with the difficult determination of where a mere regulation ends and a "taking" commences.

In 1987 the United States Supreme Court attempted to alleviate the confusion in a trilogy of land use regulation cases. *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 97 L. Ed. 2d 677, 107 S. Ct. 3141 (1987); *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 96 L. Ed. 2d 250, 107 S. Ct. 2378 (1987); *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987). In that same year we also decided *Orion Corp. v. State,* 109 Wn.2d 621, 747 P.2d 1062 (1987), *cert. denied,* 486 U.S. 1022, 100 L. Ed. 2d 227, 108 S. Ct. 1996 (1988) (*Orion* II), which attempted to reconcile past federal and state cases involving regulatory (land use) "takings". *Orion* II utilized and coordinated United States Supreme Court authority, case law of this court and scholarly comment to begin to devise a comprehensive formula for use in determining the constitutionality of land use regulations.

---

[10]The words "or damaged" in the Constitution of the State of Washington, Const. art. 1, § 16, could make Washington's Constitution more restrictive than the federal "taking" clause. However, no Washington decision has attached significance to the difference in language in the context of police power regulation. Settle, *Regulatory Taking Doctrine in Washington: Now You See It, Now You Don't,* 12 U. Puget Sound L. Rev. 339, 344 (1989). However, this court has considered actions wherein the government's actions "damaged", rather than "took" private land to be violative of Const. art. 1, § 16. *See, e.g., Great N. Ry. v. State,* 102 Wash. 348, 173 P. 40 (1918), wherein the government's blasting caused debris to fall on and damage plaintiff's railroad tracks.

## Determination of Whether To Utilize a "Taking" Analysis or a Due Process Analysis

In this state, a land use regulation which too drastically curtails owners' use of their property can cause a constitutional "taking" or can constitute a denial of substantive due process.[11] These two constitutional theories are *alternatives* in cases where overly severe land use regulations are alleged. It is critical that these two grounds be separately considered and independently analyzed because the remedies for each of these types of constitutional violation are different.

To determine which of these two constitutional tests to utilize, *the threshold inquiry* a court must make is whether the challenged regulation safeguards the public interest in health, safety, the environment or the fiscal integrity of an area.[12] A regulation which does that is to be contrasted with one that goes beyond preventing a public *harm* and actually enhances a publicly owned right in property.[13] Secondly, the court should ask whether the regulation destroys one or more of the fundamental attributes

---

[11]*Orion Corp. v. State*, 109 Wn.2d 621, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S. 1022, 100 L. Ed. 2d 227, 108 S. Ct. 1996 (1988) (*Orion II*).

[12]This type of determination has been one of the threads in the regulatory use law in Washington for decades. *See, e.g., Conger v. Pierce Cy.*, 116 Wash. 27, 198 P. 377, 18 A.L.R. 393 (1921); *Rains v. Department of Fisheries*, 89 Wn.2d 740, 575 P.2d 1057 (1978); *Maple Leaf Investors, Inc. v. Department of Ecology*, 88 Wn.2d 726, 565 P.2d 1162 (1977); *Orion II*.

[13]Landowners do not have the right to use their property in a manner injurious to the community. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491–92, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987). However, one landowner should not be forced to bear the economic burden to confer a benefit upon the public, the cost of which rightfully should be spread over the entire community. It is the tension between these two concepts which has made "regulatory takings" law so difficult for so many years. We realize that the determination of whether a given regulation seeks to protect the public from harm will not always be an easy decision. Both the conferral of benefit and the prevention of harm are often present in varying degrees. However, the initial decision as to whether the predominant goal of the regulation is the prevention of a real harm to the public or the conferral of a benefit upon other publicly held property must be made according to the facts of each individual case.

of ownership—the right to possess, to exclude others and to dispose of property.[14] If a regulation does not infringe upon a fundamental attribute of ownership, and if it protects the public from one of the foregoing listed harms, then no constitutional "taking" requiring just compensation exists.[15]

## SUBSTANTIVE DUE PROCESS

However, even if the regulation protects the public from harm, and does not deny the owners a fundamental attribute of ownership (and is thus insulated from a "takings" challenge), it still must withstand the due process test of reasonableness.[16] The inquiry here must be whether the police power (rather than the eminent domain power) has exceeded its constitutional limits. To determine whether the regulation violates due process, the court should engage in the classic 3–prong due process test and ask: (1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner.[17] "In other words, 1) there must be a public problem or 'evil,' 2) the regulation must tend to solve this problem, and 3) the regulation must

---

[14]Settle, 12 U. Puget Sound L. Rev. at 356. *See Department of Natural Resources v. Thurston Cy.,* 92 Wn.2d 656, 601 P.2d 494 (1979), *cert. denied,* 449 U.S. 830, 66 L. Ed. 2d 35, 101 S. Ct. 98 (1980); *Keystone Coal Ass'n,* 480 U.S. at 488 n.18; *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 97 L. Ed. 2d 677, 107 S. Ct. 3141 (1987); *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 73 L. Ed. 2d 868, 102 S. Ct. 3164 (1982).

[15]*Orion II,* 109 Wn.2d at 654–57. *See also First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 313, 96 L. Ed. 2d 250, 107 S. Ct. 2378 (1987); *Keystone Coal Ass'n,* 480 U.S. at 488–89; *Maple Leaf Investors, Inc. v. Department of Ecology, supra; Goldblatt v. Hempstead,* 369 U.S. 590, 8 L. Ed. 2d 130, 82 S. Ct. 987 (1962); *Mugler v. Kansas,* 123 U.S. 623, 668–69, 31 L. Ed. 205, 8 S. Ct. 273 (1897).

[16]*Orion II,* 109 Wn.2d at 654–55.

[17]*Orion II,* 109 Wn.2d at 646–47. *Lawton v. Steele,* 152 U.S. 133, 38 L. Ed. 385, 14 S. Ct. 499 (1894); *Goldblatt,* 369 U.S. at 594–95; *West Main Assocs. v. Bellevue,* 106 Wn.2d 47, 52, 720 P.2d 782 (1986).

not be 'unduly oppressive' upon the person regulated."[18] The third inquiry will usually be the difficult and determinative one.

█ The "unduly oppressive" inquiry lodges wide discretion in the court and implies a balancing of the public's interest against those of the regulated landowner. We have suggested several factors for the court to consider to assist it in determining whether a regulation is overly oppressive, namely: the nature of the harm sought to be avoided; the availability and effectiveness of less drastic protective measures; and the economic loss suffered by the property owner.[19] Another well regarded commentator in this area of the law, Professor William B. Stoebuck of the University of Washington Law School, has suggested a helpful set of nonexclusive factors to aid the court in effecting this balancing. On the public's side, the seriousness of the public problem, the extent to which the owner's land contributes to it, the degree to which the proposed regulation solves it and the feasibility of less oppressive solutions would all be relevant. On the owner's side, the amount and percentage of value loss, the extent of remaining uses, past, present and future uses, temporary or permanent nature of the regulation, the extent to which the owner should have anticipated such regulation and how feasible it is for the owner to alter present or currently planned uses. Stoebuck, *San Diego Gas: Problems, Pitfalls and a Better Way,* 25 J. Urb. & Contemp. L. 3, 33 (1983). Use of these factors can materially assist the court in determining whether or not the regulation on use is unduly oppressive to the landowner.

█ If the regulation is not aimed at a legitimate public purpose, or uses a means which does not tend to achieve it, or if it unduly oppresses the landowner, then the ordinance

[18]Stoebuck, *San Diego Gas: Problems, Pitfalls and a Better Way,* 25 J. Urb. & Contemp. L. 3, 20 (1983).

[19]*Orion II,* 109 Wn.2d at 655 n.24 (citing *Goldblatt,* 369 U.S. at 594–95).

will be struck down as violative of due process and the remedy is invalidation of the regulation. No compensation (which properly belongs with a "taking" analysis) is warranted in the face of a due process violation.

Invalidation of the ordinance (instead of compensation) also avoids intimidating the legislative body, a situation about which we have previously expressed concern.[20] For example, as commentators have observed in this connection,

> if local governments in the past had thought that enactment of a land use regulation might result in monetary awards, then "very likely no one would have proposed the planned unit development, the cluster zone, or the floating zone and even if those efforts had received the prior blessing of developers, it is highly unlikely that environmental concerns or regulation of coastal and inland waterways would ever have been risked."

Sallet, *Regulatory "Takings" and Just Compensation: The Supreme Court's Search for a Solution Continues,* 18 Urb. Law. 635, 636 (1986) (quoting Wright, *Exclusionary Land Use Controls and the Taking Issue,* 8 Hastings Const. L.Q. 545, 583 (1981)). Accordingly, many challenges to land use regulations will most appropriately be analyzed under a due

---

[20] *Orion* II, 109 Wn.2d at 649, explained: "We can protect landowners from the unfair burden by invoking *either* the constitutional guaranty that property will not be deprived without due process of law, U.S. Const. amends. 5, 14; Const. art. 1, § 3, or the constitutional requirement of just compensation whenever the state exercises its power of eminent domain to take private property for public use. U.S. Const. amend. 5; *Const. art. 1, § 16. The crucial difference lies in the remedy* to be applied: invalidation or the payment of just compensation.

"This is, of course, not an insignificant difference. Once we characterize an excessive regulation as a taking, the mandate of article 1, section 16 requires just compensation. Likewise, the Fifth and Fourteenth Amendments require payment for the time that the public had use of the land while the regulation remained effective. *First English Evangelical Lutheran Church,* 107 S. Ct. at 2388. Thus, choosing to invoke the takings analysis instead of the due process test will necessarily trigger the specter of financial liability. If all excessive regulations require just compensation, rather than invalidation, land–use decision makers, who adopt regulations in a good faith attempt to prevent a public harm, will nevertheless be held strictly liable for regulations that result in a taking. Undoubtedly, the specter of strict financial liability will intimidate legislative bodies from making the difficult, but necessary choices presented by the most sensitive environmental land–use problems."

process formula rather than under a "taking" formula. This is not to say, however, that a certain class of cases will not have to face a "taking" challenge.

## "CONSTITUTIONAL TAKINGS"

■■ Having completed the due process formula, we return to our threshold issue and consider the "taking" analysis used by the United States Supreme Court and by this court in *Orion* II. If we consider threshold inquiries and determine that the challenged regulation goes beyond preventing a public harm to actually enhance a publicly owned right in property, or if we determine that the regulation denies the owner a fundamental attribute of ownership,[21] it then becomes necessary to determine whether the regulation effects a "taking" in violation of the Fifth and Fourteenth Amendments and Const. art. 1, § 16.

The "taking" analysis requires that the court first ask whether the regulation substantially advances legitimate state interests. If it does not, then it constitutes a "taking".[22] If it does substantially advance a legitimate state interest, then it becomes necessary to look further and see if the challenge to the regulation is a facial challenge or one involving application of the regulation to specific property. It would not be necessary for the challengers to exhaust administrative remedies in a facial challenge because the allegation would be that application of the regulation to any property would constitute a "taking".[23] If the case is a facial challenge, then the landowner must show that the regulation denies all economically viable use of any

---

[21]Not every infringement on a fundamental attribute of ownership will necessarily constitute a "taking". *See, for example, Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980).

[22]*Orion* II, 109 Wn.2d at 655–56; *Nollan v. California Coastal Comm'n, supra*.

[23]Settle, *Regulatory Taking Doctrine in Washington: Now You See It, Now You Don't*, 12 U. Puget Sound L. Rev. 339, 357–58, 392–93 (1989) (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987)).

parcel of regulated property in order to constitute a taking.[24] In pursuing this inquiry, however, it first becomes necessary to determine just what property it is that the court is to consider.

■ With the exception of this court's recent decision in *Allingham v. Seattle*, 109 Wn.2d 947, 749 P.2d 160 (1988), neither state nor federal law has divided property into smaller segments of an undivided parcel of regulated property to inquire whether a *piece* of it has been taken or whether a due process violation has occurred with regard to a *piece* of regulated property. Rather, we have consistently viewed a parcel of regulated property in its *entirety*. Federal case law has also specifically refused to focus its inquiry upon a given portion of a regulated property.[25] As the United States Supreme Court in *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987) (quoting *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 130–31, 57 L. Ed. 2d 631, 98 S. Ct. 2646 (1978) explained:

> "'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature of the interference with rights *in the parcel as a whole*—here the city tax block designated as the 'landmark site.'"

---

[24]*Orion Corp. v. State*, 109 Wn.2d 621, 656, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S. 1022, 100 L. Ed. 2d 227, 108 S. Ct. 1996 (1988) (*Orion* II); *Keystone Coal Ass'n*, 480 U.S. at 494–95.

[25]*Keystone Coal Ass'n*, 480 U.S. at 496–97; *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 57 L. Ed. 2d 631, 98 S. Ct. 2646 (1978).

*Keystone*, 480 U.S. at 497.[26] Similarly, our own state case law demonstrates that a regulatory scheme's economic impact is to be determined by viewing the full bundle of property rights in its entirety.[27]

■ The landowner in the case before us relies heavily on *Allingham*'s views of a "taking" which looked only to one portion of the regulated parcel of property. To the extent that *Allingham* is inconsistent with the foregoing analysis, it is hereby overruled. Additionally, to the extent that *Allingham* equates a physical taking of an owner's land with a regulation upon its use, it is also expressly overruled.[28]

Returning to our "taking" analysis, if the challenge to the regulation is a facial one, and if the landowner succeeds in showing that a regulation denies all economically viable use of any parcel of regulated property, then a constitutional taking has occurred. Practically, however, this should prove to be a relatively rare occurrence.

■ If the challenge involves an application of the regulation to specific property, then the court should consider: (1) the economic impact of the regulation on the property; (2) the extent of the regulation's interference with invest-

---

[26] *See also Andrus v. Allard*, 444 U.S. 51, 62 L. Ed. 2d 210, 100 S. Ct. 318 (1979).

[27] *Orion* II, 109 Wn.2d at 664. *See also Department of Natural Resources v. Thurston Cy.*, 92 Wn.2d 656, 668–70, 601 P.2d 494 (1979), *cert. denied*, 449 U.S. 830, 66 L. Ed. 2d 35, 101 S. Ct. 98 (1980); *Department of Ecology v. Pacesetter Constr. Co.*, 89 Wn.2d 203, 571 P.2d 196 (1977); *Maple Leaf Investors, Inc. v. Department of Ecology*, 88 Wn.2d 726, 565 P.2d 1162 (1977).

[28] *See Keystone Coal Ass'n*, 480 U.S. at 488 n.18; *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831, 97 L. Ed. 2d 677, 107 S. Ct. 3141 (1987); *Penn Central*, 438 U.S. at 124.

ment–backed expectations;[29] and (3) the character of the government action.[30]

██ If the court determines a "taking" has, in fact, occurred, then just compensation is mandated by the Fifth and Fourteenth Amendments and by Const. art. 1, § 16.[31] If the taking was due to an overly severe land use regulation, and was temporary and reversible, the governmental unit involved has the option of curing the taking or maintaining the status quo by exercising its eminent domain

[29]The vested rights doctrine is an example of judicial recognition of investment–backed expectations. Mandelker, *Investment–Backed Expectations: Is There a Taking?*, 31 Wash. U.J. Urb. & Contemp. L. 3 (1987). In addition, the United States Supreme Court has said the expectation must be "distinct" (*Penn Central*, 438 U.S. at 124) and "reasonable" (*Pruneyard Shopping Ctr.*, 447 U.S. at 83). Professor Mandelker has suggested that "distinct" implies the expectation must have some concrete manifestation and that "reasonable" implies the expectation must be appropriate under the circumstances. This view of "investment–backed expectations" helps to give content to the analysis.

[30]*Orion II*, 109 Wn.2d at 656 (citing *Keystone Coal Ass'n*, 480 U.S. at 495). In considering the character of the government action, we note that permanent physical invasions (even if of minimal effect on the land) have routinely been held to be takings. *See, e.g., Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 73 L. Ed. 2d 868, 102 S. Ct. 3164 (1982); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 97 L. Ed. 2d 677, 107 S. Ct. 3141 (1987). However, this fact is subject to a qualification noted by the *Nollan* (483 U.S. at 836) Court. "As a prerequisite for development permission, a regulation may require a landowner to dedicate property rights for public use if the regulatory exaction is reasonably calculated to prevent, or compensate for, adverse public impacts of the proposed development." Settle, *Regulatory Taking Doctrine in Washington: Now You See It, Now You Don't*, 12 U. Puget Sound L. Rev. 339, 356 (1989). "[T]he regulatory exaction must reasonably (that is, quite specifically and proportionately) counter adverse public impact of the proposed development." Settle, 12 U. Puget Sound L. Rev. at 380 n.243 (citing *Nollan*, 483 U.S. at 836–37). *See also Unlimited v. Kitsap Cy.*, 50 Wn. App. 723, 750 P.2d 651, *review denied*, 111 Wn.2d 1008 (1988) (holding that police power is properly exercised when the problem to be remedied by the exaction arises from the development under construction).

[31]*Orion II*, 109 Wn.2d at 649; *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 321, 96 L. Ed. 2d 250, 107 S. Ct. 2378 (1987).

power. Whichever it chooses, just compensation must be paid for the period during which the taking is effective.[32]

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

As previously noted, exhaustion would be unnecessary if the landowner was engaging in a facial challenge to the ordinance. However, the record presented in this case demonstrates that the landowner has not carried the burden of showing that the regulation denies it all economically viable use of any parcel of regulated property. Therefore, we consider the landowner's exhaustion argument in the context of an "as applied" challenge.

Applying the analysis discussed above to the present case, we could arguably conclude that the challenged regulation seeks to safeguard the public interest in the environment and does not appear to enhance a publicly owned right in other property. However, it would be premature at this time to decide whether the regulation denies an essential attribute of ownership. Assuming without deciding, that the regulation should be scrutinized under the 3–prong due process analysis, we simply do not have all of the required facts needed in order for this court to apply that formula.

Although it might be possible to determine that the regulation was aimed at achieving a legitimate public purpose and that it used means to achieve that purpose, on the limited record here presented it is not possible to determine whether the regulation was unduly oppressive to this landowner. Without knowledge of the uses to which this property can legally be put, it is not feasible to consider the factors which help to determine "undue oppressiveness". Exhaustion of administrative remedies is, therefore, necessary in order for a court to have before it the facts necessary to make such a determination.

---

[32]*Orion* II, 109 Wn.2d at 626, 668; *First English Evangelical Lutheran Church*, 482 U.S. at 321.

 Although the landowners argue that exhaustion would be futile in this particular case, we disagree. Exhaustion of administrative remedies is generally required before resort to the courts, although exhaustion is excused if a resort to administrative procedures would be futile.[33] United States Supreme Court case law also concludes that a final governmental decision as to permitted uses of land is generally a condition precedent to resolution of an inverse condemnation claim such as the one before us. As that Court has observed, "[o]ur cases uniformly reflect an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it."[34] Once exhaustion is raised as a defense, the landowner seeking to establish "futility" as an exception to the exhaustion requirement must persuade the court that futility excuses exhaustion.[35] This is a substantial burden because of the strong public policies favoring the exhaustion doctrine.[36]

Our recent decision in *Estate of Friedman v. Pierce Cy.*, 112 Wn.2d 68, 768 P.2d 462 (1989) involved a challenge to a planned unit development (PUD) map which required that a substantial amount of land in the PUD remain "open space". The present case is similar in that some portion (perhaps one–third) of the owner's land will have to remain

---

[33]*Estate of Friedman v. Pierce Cy.*, 112 Wn.2d 68, 74, 768 P.2d 462 (1989).

[34]*MacDonald, Sommer & Frates v. County of Yolo*, 477 U.S. 340, 351, 91 L. Ed. 2d 285, 106 S. Ct. 2561 (1986).

[35]*Estate of Friedman*, 112 Wn.2d at 77.

[36]A presumption favoring the requirement that administrative remedies be exhausted exists, based on the following policies:

> [T]o (1) insure against premature interruption of the administrative process, (2) allow the agency to develop the necessary factual background on which to base a decision, (3) allow the exercise of agency expertise, (4) provide a more efficient process and allow the agency to correct its own mistake, and (5) insure that individuals are not encouraged to ignore administrative procedures by resort to the courts.

*Estate of Friedman*, 112 Wn.2d at 78 (quoting *Orion Corp. v. State*, 103 Wn.2d 441, 456–57, 693 P.2d 1369 (1985) (*Orion I*)) (citing *South Hollywood Hills Citizens Ass'n v. King Cy.*, 101 Wn.2d 68, 74, 677 P.2d 114 (1984)).

"open space" to protect the Hylebos wetland under present regulations. *Estate of Friedman* made clear that it will be the uncommon case where a landowner can show a constitutional violation without first exhausting available procedures in an attempt to secure a permit for possible use.[37] As noted earlier herein, King County argues that resort to administrative channels would not have been futile because the Sensitive Area Ordinance does allow development of wetlands if application of the wetland ordinance "would deny all reasonable uses of a property".[38] As also noted, the County further argues that it is entirely possible that the landowner may be permitted to build a church on its land under existing regulations.

Under all futility/exhaustion authority, when we look to the tests for regulatory "takings" and due process violations, it follows that the Superior Court and the Court of Appeals correctly concluded that the claim of the landowner in this case is not yet ripe for adjudication because it has not yet applied for a development permit.[39]

Because the landowner has not as yet sought any development permits, it is not possible to know what effect SEPA and other applicable regulations might have on the property in question. The Court of Appeals appropriately observed that without engaging in the application process, there is no way to know what beneficial use may be made of Presbytery's property, nor any way to know what deprivation of beneficial use was proximately caused by the Hylebos Wetland Ordinance.[40]

---

[37]*Estate of Friedman*, 112 Wn.2d at 80.

[38]King County Code 21.54.170(B).

[39]*Orion Corp. v. State*, 109 Wn.2d 621, 632, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S. 1022, 100 L. Ed. 2d 227, 108 S. Ct. 1996 (1988) (*Orion* II); *MacDonald, Sommer & Frates v. County of Yolo, supra; Williamson Cy. Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985); *Ackerley Communications, Inc. v. Seattle*, 92 Wn.2d 905, 602 P.2d 1177 (1979), *cert. denied*, 449 U.S. 804, 66 L. Ed. 2d 7, 101 S. Ct. 49 (1980).

[40]*Presbytery of Seattle v. King Cy.*, 53 Wn. App. 1074 (1989).

In *Estate of Friedman,* we disagreed with the landowner's claim of futility because there the evidence showed only that some county officials testified that the land under consideration had long been open space and should remain open space. In the present case, the only evidence regarding futility is the opinion of the landowner's expert that a number of lots in a hypothetical subdivision would have to remain open space. This was countered, however, by an affidavit of the appropriate county decisionmaker to the effect that under present regulations, the landowner would probably be allowed to build a church on the property. Clearly then, under a proper definition of regulatory "taking" and substantive due process, the Presbytery has not sustained its burden of showing that exhaustion would be futile.

Affirmed.

CALLOW, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, and GUY, JJ., concur.

DORE, J., concurs in the result.

Reconsideration denied May 17, 1990.