[No. 28147-0-I.   Division One.   March 23, 1992.]

BELLEVUE 120TH ASSOCIATES, *Appellant,* v. THE CITY OF BELLEVUE, *Respondent.*

*Charles E. Watts* and *Oseran, Hahn, Van Valin & Watts, P.S.,* for appellant.

*Richard L. Andrews, City Attorney,* and *David E. Kahn, Assistant; Christopher E. Mathews* and *Brown & Mathews,* for respondent.

FORREST, J. — The trial court granted the City of Bellevue's motion for summary judgment dismissing the inverse condemnation claim of Bellevue 120th Associates (the Associates). The Associates appeals. We affirm.

On December 30, 1983, the Associates, a limited partnership of real estate developers, purchased 7.2 acres of undeveloped property in the city of Bellevue. The property was zoned "light industrial" and the Associates intended to clear and fill the property and build a warehouse on the site.

In May 1984 the Associates submitted an application for a clearing and grading permit, which received a negative response from the City. On November 12, 1984, the Associates submitted a building permit application and an environmental checklist. The plan called for filling 75 percent of the existing wetland and covering 77 percent of the site with impervious surface. On February 25, 1985, the City issued a determination of significance (DS) for the proposal in accordance with the requirements of the State Environmental Policy Act of 1971 (SEPA). Subsequent to this action on this particular property, in May of 1985, the Bellevue City Council adopted "Natural Determinants Policies" to limit development of wetlands within the city.

The Associates did not appeal the DS, as provided for in former Bellevue City Code 22.02.080,[1] nor did it proceed with an environmental impact statement (EIS), as required by SEPA. Instead, the Associates attempted to negotiate with the City to find a design that would result in a mitigated determination of significance, thus avoiding the necessity of an EIS and allowing development. In July of 1985 the director of the city Design and Development Department, Matthew Terry, and the director of Storm and Surface Water Utility, Pam Bissonnette, sent the Associates a letter commenting on the development plans. The letter indicated that "the proposal as it has been submitted cannot comply with" existing city code, and is in conflict with the newly developed Natural Determinants Policies, and "could result in the denial of the project." The letter suggested the Associates "reevaluate" its current plans, and offered to assist the Associates in developing alternatives.

The Associates instituted this suit in October of 1985 believing the City, through the letter and other communications, along with the Natural Determinants Policies and

---

[1]"A. Right to Appeal: Any person aggrieved by a threshold determination made by the Environmental Coordinator may appeal said determination to the City of Bellevue Hearing Examiner."

other development decisions, signaled its intention to deny all development of the property. The trial court dismissed the suit based on the City's claim that the Associates failed to exhaust administrative remedies.

■ A final governmental decision regarding permitted uses of land is a condition precedent to resolution of an inverse condemnation claim.[2] The claim that government regulation amounts to a taking is not ripe until the governmental agency charged with implementing the regulation has reached a final decision regarding application of the regulation to the particular property.[3] A claim for inverse condemnation cannot be evaluated until a final administrative decision presents a definitive determination of the economic impact of the regulation.[4] The concepts of exhaustion and ripeness are related concepts in the land use area. The State Supreme Court noted in *Estate of Friedman v. Pierce Cy.*, 112 Wn.2d 68, 80, 768 P.2d 462 (1989):

> Concepts of finality, ripeness, and exhaustion tend to overlap in this area, yet it is apparent that this State's exhaustion requirement is entirely consistent with notions of finality and ripeness as those terms are used in federal inverse condemnation analysis. The exhaustion doctrine tends to assure that some final governmental determination as to use has been made, thus facilitating resolution of the question whether land use regulations so deprive the land of economic viability as to amount to a taking.

Compelling public policies underlie the requirement of exhaustion of administrative remedies, including:

> [T]o (1) insure against premature interruption of the administrative process, (2) allow the agency to develop the necessary factual background on which to base a decision, (3) allow the exercise of agency expertise, (4) provide a more efficient process and allow the agency to correct its own mistake, and (5)

---

[2]*Estate of Friedman v. Pierce Cy.*, 112 Wn.2d 68, 79, 768 P.2d 462 (1989).

[3]*Estate of Friedman*, at 79 (citing *Williamson Cy. Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985)).

[4]*Estate of Friedman*, at 79.

insure that individuals are not encouraged to ignore administrative procedures by resort to the courts.

*Estate of Friedman*, at 78 (quoting *Orion Corp. v. State*, 103 Wn.2d 441, 456-57, 693 P.2d 1369 (1985) (*Orion* I)).

The Associates concedes that it did not exhaust its administrative remedies and that summary judgment was proper unless it was excused from exhausting the remedies by the doctrine of futility. The Associates' reliance on *Orion* I is misplaced.

*Orion* I is an example of the rare circumstances that will allow a party to avoid the available administrative remedies. In *Orion* I the developer's property in Padilla Bay was designated by name in numerous regulatory schemes, prohibiting economic use of the property.[5] The subject property was made part of a state estuarine sanctuary, including an interpretative center encompassing all of the acreage controlled by the petitioner. The court noted that the record revealed much more than a policy to preserve a type of land in its natural state, but rather the fruition of that policy by the creation of the sanctuary thus precluding development. The very unusual facts of *Orion* I are not present here.

The Associates did not appeal from the determination of significance[6] nor did it ever submit an EIS. Instead, it attempted to obtain a mitigated determination of significance. While it offered a proposal that included, among other changes, off-site mitigation, the Associates did not meet the Washington Administrative Code requirement showing a binding commitment for acquisition of these sites. Likewise, it never revised its permit applications to conform to the suggested redesign. In fact, the Associates never submitted a formal redesign application. The affidavit of city official Toni Cramer states that the City would have

---

[5] *Orion* I, at 449.

[6] For instance, in its complaint for declaratory relief the Associates contends the "wet" condition of the property is a recent phenomenon and is neither natural nor historical and was in fact created by the actions of adjoining property owners and the City.

seriously considered a mitigated determination had the building permit been properly amended. Without a fully documented submission, the City was under no obligation to make a final decision, and indeed was unable to do so.

The Associates argues that the 1985 Bellevue ordinance setting forth the "Natural Determinants Policies" establishes the futility of proceeding with the administrative process. It should be noted, however, that the initial determination of significance, and therefore the requirements of the EIS process, was made prior to the adoption of this ordinance and was based on SEPA considerations and these requirements have not been satisfied absent the 1985 ordinance. The Associates' reliance on the 1985 ordinance to prove no development is possible is misplaced. The ordinance specifically states, "The City does not intend to deny all economic use of any property in these waterways, flood plains and wetlands; however, the City is not obligated to guarantee the maximum economic use of any property in these areas." Bellevue resolution 4541.

It certainly is true that the ordinance indicated there would be very severe limits on the development of wetlands. However, the city council is entitled to an opportunity to strike a balance between acceptable development and protection of the wetlands. Indeed, this case shows exactly why the "exhaustion requirement" is so essential. If, as the Associates contends, it is the "Natural Determinants Policies" that forecloses development, it would still be necessary to ascertain what, if any, development was permissible under SEPA in order to finally determine the fair value of the property in an inverse condemnation action. Oddly in that context, the Associates would argue for a maximum development to enhance the value of the property being taken and the City would advance the minimum development to reduce the value of the property taken.

Furthermore, the "Natural Determinants Policies" are citywide policies and not directly aimed at this particular property as was the case in *Orion* I. Indeed, confronted with

the choice of condemning the property or modifying the limitations on use, even the same city council that adopted the "Natural Determinants Policies" might well opt for some significant development. Factually, the Associates had a persuasive case in light of the development of the immediately surrounding property and it certainly is not impossible that an economically feasible solution could have been arrived at. In any event, it is the council's responsibility in the first instance to make this decision and it is inappropriate for the court to assume the outcome of the administrative process. It would be also unacceptable to hold that the passage of a general wetlands ordinance results in committing the City to condemnation of one particular parcel that was never considered individually.

In addition to the ordinance, the Associates places great reliance on the letter of July 17, 1985, and a memorandum of July 19, 1985, from Toni Cramer, acting environmental coordinator, to establish that any development was foreclosed. The reliance is misplaced. The July 17 letter is plainly advisory in nature stating that the development as then proposed would not likely meet the regulations. The letter suggested that alternatives be considered and offered the City's assistance. Likewise, the memorandum of July 19, 1985, merely advises the other authorities interested in the permit that the EIS process would remain on hold until the Associates provides certain information and revised plans. Neither of these documents represents a final decision.[7]

The Associates attempts to distinguish the cases of *Estate of Friedman v. Pierce Cy.*[8] and *Presbytery of Seattle v. King Cy.*,[9] but in fact these cases are controlling. The Associates

---

[7]In fact, in deposition testimony Toni Cramer stated that it was the policy of the Department of Design and Development to advise applicants as early as possible what the concerns were with a proposal and to recommend the EIS process as early as possible when it appeared likely that impacts were significant. This early notice is intended to speed the process, saving both time and money.

[8]112 Wn.2d 68, 768 P.2d 462 (1989).

[9]114 Wn.2d 320, 787 P.2d 907 (1990).

claims that the key to these cases was that the developers never submitted permit applications and therefore the record was inadequate for appellate review. Indeed, in this case the Associates never submitted an amended permit application. However, the significance of the lack of permit applications in the cases cited is that there was no *final* administrative decision made and the court was unable to evaluate the taking claims.[10] Without a final determination the courts cannot ascertain the remaining value of the regulated property.[11] The Associates' insistence that the record in this case is adequate because it contains over 1,000 pages is immaterial. The Associates essentially requests the court to interpret the City's regulations and anticipate how those regulations will be applied. While the outcome of such application of the regulations was likely to result in less than the Associates wanted, this does not excuse it from pursuing the process.

In its reply brief the Associates states, "What Appellants ask of this Court is that they be allowed to cut through the costly and useless administrative and quasi-judicial tangle . . .". It seems more appropriate to say that what the Associates wants is for the court to find it a buyer by forcing the City to purchase in an inverse condemnation action without the Associates having exhausted the administrative process to show that development is impossible.

The record suggests that the Associates chose not to proceed with the administrative process because of the expense involved combined with the uncertain outcome. Joseph Mitter, lead partner of the Associates, noted that the Associates was already heavily in debt on the project and "did not have the ability to continue to hold on to the property" and proceed with the process. The Associates was

---

[10]*See Presbytery,* at 338; *Friedman,* at 79. *See also Williamson Cy. Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 186, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985) (The applicants submitted a building permit that had been denied, but had not availed themselves of the opportunity to seek a variance or appeal the decision. Therefore a "final" administrative decision was absent and the issue was not ripe.).

[11]*See Presbytery,* at 340; *Friedman,* at 80.

"fearful that it [the EIS] could be a waste of money given the *apparent* position of the City of Bellevue . . .". (Italics ours.) The point of the administrative process is to determine the City's position and furnish a basis for judicial review. The Associates should not be excused from completing the administrative process because compliance would have been costly. Justice Stevens, concurring in *Williamson Cy. Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 204, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985), stated that such expense is the "inevitable cost of doing business in a highly regulated society."

Affirmed.

COLEMAN and PEKELIS, JJ., concur.

Review denied at 119 Wn.2d 1021 (1992).