[No. 27988-2-I.    Division One.    August 24, 1992.]

ROBERT W. POWERS, *Appellant,* v. SKAGIT COUNTY,
ET AL, *Respondents.*

*David A. Svaren* and *Twede & Svaren, Inc., P.S.,* for appellant.

*Michael E. Rickert, Prosecuting Attorney,* and *John R. Moffat, Deputy; Judith W. Constans* and *Merrick, Hofstedt & Lindsey; Kenneth O. Eikenberry, Attorney General,* and *Allen T. Miller, Jr., Assistant,* for respondents.

SCHOLFIELD, J. — Robert Powers brought this action against defendants Skagit County and the State of Washington for a writ of mandamus, or in the alternative, money damages. He later amended his complaint to allege a denial of substantive due process. Powers alleged that state and county regulations prohibiting development in floodways and the County's adoption of floodway maps placing his property within the floodway deprived him of all economically viable uses of his property. From a summary judgment in favor of defendants, Powers appeals. We reverse.

## FACTS

Powers was the principal in a corporation named Camelot Farms, Inc. (Camelot), in 1969. In that year, Camelot purchased a 50-acre parcel of land adjacent to the Skagit River

in Skagit County, Washington. Camelot proposed to plat the lower 13 acres of the 50-acre parcel into 34 lots and sought to develop 110 additional lots on the remaining 37 acres. To develop the property as residential property, Camelot was required to obtain a water resources permit from the State of Washington, Department of Natural Resources.

Prior to obtaining the permit, Camelot had to demonstrate the flood frequency of its property to the Department's satisfaction. It was ultimately determined that the property was in a 25-year floodplain. The Department issued Camelot a permit in perpetuity for the construction of a residential plat, with work authorized to commence on or before October 1, 1969.

The plat was never acted on by Camelot. In 1974, the State adopted regulations that prohibited the construction of residential structures in 100-year floodways. WAC 508-60-040(3), (4). By 1976, Powers had succeeded to Camelot's ownership of the 50 acres. In 1977, Powers replatted a portion of the property into 14 1-acre lots, and the plat was approved by Skagit County. Powers then sold his contiguous acreage to the north, which consisted of 35 acres. He also apparently sold some of the lots in his 14-acre tract; however, no structures have been built on these 14 lots.

In 1983, Powers was issued a building permit by Skagit County for lot 11, which presumably is among the 14 1-acre lots in the plat. This permit expired after no action was taken on it for 180 days. In 1987, the Skagit County Board of County Commissioners adopted the new Federal Emergency Management Agency floodway maps, *see* Skagit County Code (SCC) 15.20.070, which placed Powers' entire residential plat within the floodway. Also in 1987, the Washington Legislature enacted RCW 86.16.041, which required that any new floodplain management ordinance enacted by a city, county or town must be approved by the State Department of Ecology. The statute further requires that local regulations prohibit any new residential structures within designated floodways. *See* RCW 86.16.041(2)(a); WAC 173-158-070 (additional floodway requirements). In December 1988,

the Skagit County Board of Commissioners amended the Skagit County Code to incorporate RCW 86.16.041, prohibiting residential construction in the floodway. *See* SCC 15.20-.200.

On the basis of the above regulations, the County denied Powers' application for a building permit on lot 11 in May 1989. Powers then brought this suit against the County and State in November 1989. Powers requested that the trial court issue a writ of mandamus directing the County to issue a building permit to allow construction on his property. Alternatively, Powers sought monetary damages on the theory that he had been denied his property rights without just compensation. Powers later amended his complaint to include an allegation that his right to substantive due process was denied. Powers also alleged that the County was negligent in failing to except his property when it adopted floodway ordinances. Following the trial court's dismissal of Powers' claims on summary judgment, Powers brought this appeal.

At the outset, we note that the bulk of Powers' arguments is based on the takings and due process analyses stated in *Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 787 P.2d 907, *cert. denied*, 498 U.S. 911, 112 L. Ed. 2d 238, 111 S. Ct. 284 (1990) and *Orion Corp. v. State*, 109 Wn.2d 621, 654, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S. 1022, 100 L. Ed. 2d 227, 108 S. Ct. 1996 (1988). However, following oral argument in this case, three cases were decided which have a direct bearing on our decision here. The first two are from our State Supreme Court and pertain primarily to takings and due process claims. *See Sintra, Inc. v. Seattle*, 119 Wn.2d 1, 829 P.2d 765 (1992); *Robinson v. Seattle*, 119 Wn.2d 34, 830 P.2d 318 (1992). The third case, *Lucas v. South Carolina Coastal Coun.*, ___ U.S. ___, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992), was decided after *Sintra* and *Robinson* and involved the issue of whether a land use regulation accomplished a taking of property under the Fifth and Fourteenth Amendments.

Powers' central contention in this case is that the State and County cannot be insulated from a takings claim until the trial court first considers the economic impact of the regulations on him as a landowner. In resolving his claim, we first summarize the *Presbytery* framework, including the threshold inquiry, the takings analysis, and the substantive due process analysis. We then discuss the impact of the Court's decision in *Lucas v. South Carolina Coastal Coun.*, *supra*, before proceeding to resolve Powers' claims.

## *PRESBYTERY* ANALYSIS

1. Threshold Inquiry.

Under *Presbytery*, a land use regulation may be challenged either as an unconstitutional taking without just compensation or as a violation of substantive due process. *Robinson*, 119 Wn.2d at 49; *Presbytery*, 114 Wn.2d at 329. To determine whether a takings analysis is available, the first step is a threshold inquiry. *Robinson*, 119 Wn.2d at 49. This inquiry first asks whether the challenged regulation protects the public interest in health, safety, the environment, or fiscal integrity. *Robinson*, 119 Wn.2d at 49; *Presbytery*, 114 Wn.2d at 329. Such regulations are to be contrasted with those which seek less to prevent a harm than to impose on those regulated the requirement of providing an affirmative public benefit. *Robinson*, 119 Wn.2d at 49; *Sintra*, 119 Wn.2d at 14; *Presbytery*, 114 Wn.2d at 329. Second, the court asks whether the regulation destroys or derogates any fundamental attribute of ownership: the rights to possess exclusively, to exclude others, and to dispose of property. *Robinson*, 119 Wn.2d at 49-50; *Presbytery*, 114 Wn.2d at 329-30. If the regulation does not destroy a fundamental attribute of ownership and does no more than protect the public health, safety, and welfare, then it is not subject to a takings challenge under *Presbytery*, although it is still subject to a substantive due process test for reasonableness. *Robinson*, 119 Wn.2d at 50.

2. Takings Analysis.

If the court determines that a regulation is susceptible to a takings challenge, it applies the "taking" inquiry. *Robinson*, 119 Wn.2d at 50. The court first determines whether

the regulation substantially advances legitimate state interests. *Robinson*, 119 Wn.2d at 50. If it does not, then the regulation is a per se taking. *Robinson*, 119 Wn.2d at 50; *Presbytery*, 114 Wn.2d at 333. If the regulation does substantially advance legitimate state interests, then the court determines whether the plaintiff's challenge to the regulation is a facial challenge or an "as applied" challenge. *Robinson*, 119 Wn.2d at 50. Exhaustion of administrative remedies is not required for a facial challenge. The plaintiff must demonstrate that the regulation denies all economically viable use of *any* parcel of regulated property before a taking will be found. *Robinson*, 119 Wn.2d at 50. In an "as applied" challenge (involving the application of the regulation to a specific property), the court considers: (1) the economic impact of the regulation on the property; (2) the extent of the regulation's interference with investment-backed expectations; and (3) the character of the government action. *Robinson*, 119 Wn.2d at 51; *Presbytery*, 114 Wn.2d at 335-36. If the court determines that a taking has occurred, just compensation is required. *Robinson*, 119 Wn.2d at 51.

3. Substantive Due Process Analysis.

Where the regulation protects the public from harm and does not deny the owner a fundamental attribute of ownership, it is insulated from a takings challenge under *Presbytery*. *Presbytery*, 114 Wn.2d at 330; *Robinson*, 119 Wn.2d at 51. However, the regulation is still subject to the substantive due process test for reasonableness. *Robinson*, 119 Wn.2d at 51; *Presbytery*, 114 Wn.2d at 330. The inquiry here must be whether the police power (rather than the eminent domain power) has exceeded its constitutional limits. *Presbytery*, 114 Wn.2d at 330.

> To determine whether the regulation violates due process, the court should engage in the classic 3-prong due process test and ask: (1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner.

*Presbytery*, 114 Wn.2d at 330-31. *See also Robinson*, 119 Wn.2d at 51. The analysis of "undue oppressiveness" lodges wide discretion with the trial court, and will often be the

most difficult and determinative factor. *Presbytery*, 114 Wn.2d at 331; *Robinson*, 119 Wn.2d at 51.

If the regulation fails to meet any of the three prongs of the substantive due process analysis, then it is subject to invalidation. *Presbytery*, 114 Wn.2d at 331-32; *Robinson*, 119 Wn.2d at 52. However, under *Presbytery*, no compensation is warranted for a due process violation. *Presbytery*, 114 Wn.2d at 332. *But see Robinson*, 119 Wn.2d at 52 (violation of plaintiff's rights to substantive due process may in limited circumstances form the basis for independent federal statutory relief that provides for the remedy of damages).

### LUCAS V. SOUTH CAROLINA COASTAL COUNCIL

While our Supreme Court has yet to construe *Lucas v. South Carolina Coastal Coun.*, *supra*, it has not read other recent federal decisions as mandating a consideration of economic impact in determining whether a claim is insulated from a takings challenge. For example, in *Orion*, 109 Wn.2d at 654, the court relied on both *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987) and *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 96 L. Ed. 2d 250, 107 S. Ct. 2378 (1987) to lay the groundwork for the analysis later set out in *Presbytery*.

> As we read the *Keystone Coal Ass'n* opinion, exercises of the police power cannot be characterized as a compensable taking whenever the state imposes land use restrictions in order to safeguard the "*public* interest in health, the environment, and the fiscal integrity of the area." (Italics ours.) *Keystone Coal Ass'n*, 94 L. Ed. 2d at 490. This insulation from the takings analysis continues, even if the regulation denies a landowner all economically viable use of the property. *First English Evangelical Lutheran Church*, 107 S. Ct. at 2384-85.

*Orion*, 109 Wn.2d at 654. At least one commentator has questioned whether the *Orion* court properly construed the meaning of *Keystone* and *First English*. *See* Settle, *Regulatory Taking Doctrine in Washington: Now You See It, Now You Don't*, 12 U. Puget Sound L. Rev. 339, 376-77 (1988-1989). However, the United States Supreme Court denied

certiorari in both *Orion Corp. v. State*, 109 Wn.2d 621, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S. 1022, 100 L. Ed. 2d 227, 108 S. Ct. 1996 (1988) and *Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 787 P.2d 907, *cert. denied*, 498 U.S. 911, 112 L. Ed. 2d 238, 111 S. Ct. 284 (1990), which suggests that the approach of these cases was sufficient — at least until the Court's decision in *Lucas v. South Carolina Coastal Coun., supra* — to pass federal constitutional muster. We must now determine whether the *Lucas* opinion mandates a reconsideration of this view.

In *Lucas*, petitioner David Lucas purchased two residential lots on a South Carolina island with the intent of building single-family homes. *Lucas*, 112 S. Ct. at 2889. Two years later the State Legislature enacted a law barring Lucas from constructing any permanent habitable structures on his parcels. *Lucas*, 112 S. Ct. at 2889. The Court was faced with deciding whether the law's effect on the economic value of Lucas' lots accomplished a taking of private property under the Fifth and Fourteenth Amendments requiring the payment of compensation. *Lucas*, 112 S. Ct. at 2889.

In analyzing Lucas' claim, the Court identified at least two discrete categories of regulatory action that are compensable without "case-specific inquiry into the public interest advanced in support of the restraint." *Lucas*, 112 S. Ct. at 2893.

> The first encompasses regulations that compel the property owner to suffer a physical "invasion" of his property. In general (at least with regard to permanent invasions), no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation. . . .
> The second situation in which we have found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land. *See Agins* [*v. Tiburon*], 447 U.S. [255], at 260, 100 S.Ct., at 2141 [(1980)]; see also *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987); *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 495, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987); *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 295-296, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981). As we have said on numerous occasions, the Fifth Amendment is violated when land-use regulation "does not substantially advance legitimate

> state interests *or denies an owner economically viable use of his land.*"

(Footnotes and citations omitted.) *Lucas,* 112 S. Ct. at 2893-94. The trial court had found that Lucas' property had been rendered valueless by the enforcement of the construction ban, and because this finding had been effectively unchallenged on appeal, the Court found that it entitled Lucas to compensation. *Lucas,* 112 S. Ct. at 2890.

The South Carolina Supreme Court had ruled that the regulations at issue were police power enactments, and thus fell within a line of court precedent sustaining against due process and takings clause challenges the State's use of its "police powers" to enjoin activities akin to nuisances. *Lucas,* 112 S. Ct. at 2896-97. The *Lucas* Court acknowledged that prior opinions had suggested that " 'harmful or noxious uses' " of property could be proscribed by regulation without compensation. *Lucas,* 112 S. Ct. at 2897. The Court stated, however, that the harmful or noxious use analysis was simply the progenitor of the more contemporary statement that land use regulation does not amount to a taking if it substantially advances legitimate state interests. *Lucas,* 112 S. Ct. at 2897.

> When it is understood that "prevention of harmful use" was merely our early formulation of the police power justification necessary to sustain (without compensation) *any* regulatory diminution in value; and that the distinction between regulation that "prevents harmful use" and that which "confers benefits" is difficult, if not impossible, to discern on an objective, value-free basis; it becomes self-evident that noxious-use logic cannot serve as a touchstone to distinguish regulatory "takings" — which require compensation — from *regulatory* deprivations that do not require compensation. *A fortiori* the legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated.

*Lucas,* 112 S. Ct. at 2888-89. The Court proceeded to set forth the following principles to govern regulatory taking cases:

> Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the

nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with. . . .

. . . Any limitation so severe [as to prohibit all economically viable use of land] cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership.[1]

(Footnotes and citations omitted.) *Lucas*, 112 S. Ct. at 2899-2900. The Court lists several factors that are relevant in determining whether a use is proscribed by " 'existing rules or understandings" of state property and nuisance law. *Lucas*, 112 S. Ct. at 2900-01.

The "total taking" inquiry we require today will ordinarily entail (as the application of state nuisance law ordinarily entails) analysis of, among other things, the degree of harm to public lands and resources, or adjacent private property, posed by the claimant's proposed activities, the social value of the claimant's activities and their suitability to the locality in question, and the relative ease with which the alleged harm can be avoided through measures taken by the claimant and the government (or adjacent private landowners) alike. The fact that a particular use has long been engaged in by similarly situated owners ordinarily imports a lack of any common-law prohibition (though changed circumstances or new knowledge may make what was previously permissible no longer so[)]. So also does the fact that other landowners, similarly situated, are permitted to continue the use denied to the claimant.

(Citations omitted.) *Lucas*, 112 S. Ct. at 2901.

---

[1]The Court uses the hypotheticals of a lake bed owner and the corporate owner of a nuclear generating plant. The lake bed owner, the Court stated, "would not be entitled to compensation when he is denied the requisite permit to engage in a landfilling operation that would have the effect of flooding others' land." *Lucas*, 112 S. Ct. at 2900. Similarly, the corporate owner of the nuclear generating facility would not be entitled to compensation when, on discovery that the plant sits astride an earthquake fault, it is directed to remove all improvements from the land. "Such regulatory action may well have the effect of eliminating the land's only economically productive use, but it does not proscribe a productive use that was previously permissible under relevant property and nuisance principles. The use of these properties for what are now expressly prohibited purposes was *always* unlawful, and (subject to other constitutional limitations) it was open to the State at any point to make the implication of those background principles of nuisance and property law explicit." *Lucas*, 112 S. Ct. at 2900-01.

The Court concluded by stating that it was unlikely that common law principles would have prevented Lucas from building habitable structures or improvements on his land. *Lucas*, 112 S. Ct. at 2901. The question, however, was one to be dealt with on remand. The Court held that, on remand, South Carolina would bear the same burden it would have had had it sought to restrain Lucas in a common law action for public nuisance; it must "identify background principles of nuisance and property law that prohibit the uses he [Lucas] now intends in the circumstances in which the property is presently found." *Lucas*, 112 S. Ct. at 2901-02.

IMPACT OF *LUCAS* ON *PRESBYTERY* ANALYSIS

1. "Pre-Threshold" Analysis.

█ In our view, *Lucas* mandates compensation for a taking whenever land use restrictions deny a landowner of all economically viable use of his property, unless the restriction is one that background principles of this State's law of property and nuisance already place upon ownership. Under this rule, a landowner meeting the requirements for categorical treatment under *Lucas* is entitled to compensation, even though the regulation at issue would otherwise be insulated from a takings challenge under *Presbytery*.

Lucas therefore imposes a "prethreshold" step on the *Presbytery* framework. At the outset, the plaintiff must have the opportunity to demonstrate that the regulations at issue strip his property of *all* economically viable use. The State at this point will have the opportunity to rebut this claim with evidence that some economically viable use exists for the plaintiff's property. The State may further seek to show that plaintiff's use is proscribed by " 'existing rules or understandings" of this State's property and nuisance law. *See Lucas*, 112 S. Ct. at 2901. If the State prevails on either (or both) grounds, the plaintiff will not be entitled to categorical takings treatment under *Lucas* and the court will proceed to analyze the case under the *Presbytery* framework. However, if the court finds categorical treatment under *Lucas* appropriate, then plaintiff will be entitled to compensation

for a taking without "case-specific inquiry into the public interest advanced in support of the restraint." *Lucas v. South Carolina Coastal Coun.*, 112 S. Ct. at 2893.

In this case, Powers apparently sought to build residential structures on his property. As in *Lucas*, "[i]t seems unlikely that common-law principles would have prevented the erection of any habitable or productive improvements on [his] land". *Lucas*, 112 S. Ct. at 2901. However, without benefit of briefing or argument, we decline to address this issue for the first time on appeal. It is a matter for the trial court to address on remand.

Powers argued at trial that "[u]nder current regulations, [his] property has *virtually* no profitable use or value." (Italics ours.) In his brief, Powers suggests that his land has *no* economically viable use under the regulations. Both claims amount to bare conclusions without any supporting facts.

The County claims that even if Powers is denied all economically viable use of his property, the law prohibits compensation. In light of the *Lucas* holding, the County's argument goes too far and is incorrect. While Powers' affidavit states only a bare conclusion, it, nevertheless, in the context of this case, cannot be totally ignored. We cannot determine as a matter of law whether Powers' property has any economically viable use remaining. For that reason, we conclude that summary judgment as to Powers' "taking" claim must be reversed.

■ The trial court may determine on remand that the regulations, while severely diminishing the economic viability of Powers' land, do not totally eliminate all economically viable uses. As indicated above, the trial court shall then employ the *Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 787 P.2d 907, *cert. denied*, 498 U.S. 911, 112 L. Ed. 2d 238, 111 S. Ct. 284 (1990) framework in resolving Powers' claim. However, where a regulation has deprived a property of some (but not all) economically viable use, must the court consider this less-than-total deprivation in conducting the threshold *Presbytery* inquiry? Following careful consideration of Powers' arguments on this question, we believe that

in this case the answer must be "no". In its analysis, however, the trial court must decide what is or is not an "economically viable use" in the context of the facts of each case.

The appropriate steps of the *Presbytery* analysis, as well as the proper sequence of those steps, was made abundantly clear by the court in *Robinson v. Seattle*, 119 Wn.2d 34, 830 P.2d 318 (1992). *Robinson's* discussion of the *Presbytery* framework plainly indicates that economic impact is not considered until after the court *passes* the threshold inquiry and engages in the actual takings analysis. *Robinson*, 119 Wn.2d at 51. While economic impact may have some relevance in the threshold inquiry where the landowner claims that the regulation goes beyond harm prevention to enhance a public good,[2] Powers has made no such allegation in this case.

The bulk of Powers' arguments on this question is based on *Orion Corp. v. State*, 109 Wn.2d 621, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S. 1022, 100 L. Ed. 2d 227, 108 S. Ct. 1996 (1988) and *Presbytery*. We have carefully considered Powers' arguments and find them to be unpersuasive.[3] In

---

[2]The facts of *Sintra, Inc. v. Seattle*, 119 Wn.2d 1, 829 P.2d 765 (1992) and *Robinson* provide an example of this principle. The regulation at issue in those cases, the Housing Preservation Ordinance (HPO), required landowners wishing to alter use of their property to either replace the low income housing or pay extremely high sums of money into a housing replacement fund. *Sintra*, at 15; *Robinson*, at 52-53. In both cases, the court found the HPO provisions not insulated from a takings challenge, as they went beyond public harm prevention to require the provision of a public benefit. *Sintra*, at 15-16; *Robinson*, at 52-53.

[3]With the exception of the "total" takings inquiry of *Lucas*, and claims that regulations go beyond preventing public harm to requiring an affirmative benefit, see footnote 2, economic impact is not properly considered at the threshold stage of *Presbytery*. Powers suggests that the *Presbytery* court's ultimate disposition of the case indicated its consideration of economic impact in conducting the threshold inquiry. We disagree. The court ruled that the case was not yet ripe for adjudication because Presbytery had not yet exhausted administrative remedies by applying for a development permit. *Presbytery*, at 339. For that reason, the court indicated that "there is no way to know what beneficial use may be made of Presbytery's property, nor any way to know what deprivation of beneficial use was proximately caused by the . . . Ordinance." *Presbytery*, at 339.

Powers also argues that in *Orion*, 109 Wn.2d at 665, the court was unable to balance the extent to which the regulations at issue impacted the market value

short, under the facts of this case, evidence that Powers' property has suffered a partial loss of economic viability is not relevant under the threshold analysis of *Presbytery*. He concedes that the floodway regulations were enacted for purposes of safeguarding the public interest and health. He has failed to demonstrate how the regulations destroy a fundamental attribute of property ownership. Therefore, unless Powers can demonstrate on remand that he is entitled to categorical treatment under *Lucas* (by showing that his property retains no economically viable use as a result of the regulations), then the trial court's determination that the regulations are insulated from his takings challenge must be affirmed.

2. Due Process.

Powers has conceded the first two prongs of *Presbytery*'s due process framework. He admits that the floodway regulations are aimed at achieving a legitimate public purpose, and that the means are reasonably related to that purpose. However, he argues that the trial court failed to properly address the third prong of the analysis — "undue oppressiveness". He contends that this determination requires a balancing of factors and that it is questionable that such an inquiry could be resolved on summary judgment.

As noted by the court in *Presbytery*, the "undue oppressiveness" inquiry will generally be the difficult and determinative one. It is an inquiry that:

---

of the property because the trial court had not determined whether Orion's property retained a fair market value. Again, Powers suggests that this indicates that economic impact must be considered in conducting the "threshold inquiry" of whether a taking has occurred. Again, we disagree.

The section of the *Orion* opinion relied upon by Powers begins with this statement: "If the trial court determines that the State *cannot claim insulation from Orion's takings challenge*, a compensable taking may have occurred." (Italics ours.) *Orion*, at 663. The court goes on to state that, to demonstrate a "taking" under such circumstances, Orion must show that the regulations either "do not substantially advance a legitimate governmental purpose" or cause "a sufficiently significant economic deprivation." *Orion*, at 663. The court's economic deprivation analysis at page 665 is based on an *assumption* that the State was not insulated from a takings challenge.

lodges wide discretion in the court and *implies a balancing of the public's interest against those of the regulated landowner.* We have suggested several factors for the court to consider to assist it in determining whether a regulation is overly oppressive, namely: the nature of the harm sought to be avoided; the availability and effectiveness of less drastic protective measures; and the economic loss suffered by the property owner. Another well regarded commentator in this area of the law, Professor William B. Stoebuck of the University of Washington Law School, has suggested a helpful set of nonexclusive factors to aid the court in effecting this balancing. On the public's side, the seriousness of the public problem, the extent to which the owner's land contributes to it, the degree to which the proposed regulation solves it and the feasibility of less oppressive solutions would all be relevant. On the owner's side, the amount and percentage of value loss, the extent of remaining uses, past, present and future uses, temporary or permanent nature of the regulation, the extent to which the owner should have anticipated such regulation and how feasible it is for the owner to alter present or currently planned uses.

(Footnote omitted. Italics ours.) *Presbytery*, 114 Wn.2d at 331.

At the trial court, Powers argued that various regulations prohibited use of his property for residential or commercial purposes and that his parcels were too small to be farmed. He argues that the trial court granted summary judgment to defendants without ever addressing the "undue oppressiveness" aspect of *Presbytery*. While this claim is not entirely accurate, we nonetheless believe that the trial court erred in dismissing Powers' due process claim on summary judgment.

As indicated in *Presbytery*, addressing a claim of undue oppressiveness requires a balancing of factors. It can be expected that some factors will favor the public interest and some will favor the landowner. As previously indicated, Powers' affidavit alleging that his property has virtually no profitable use or value is conclusory and without supporting facts. However, as we have also stated, the County's contention that Powers is without a remedy even if the regulation denies all economically viable use is incorrect. In the context of this case, Powers' affidavit cannot be totally dis-

regarded. The court cannot rule as a matter of law that the effect of the regulations on Powers is not unduly oppressive. We conclude that a genuine issue as to undue oppressiveness exists in this case and cannot be resolved on summary judgment by the record made before the trial court. Neither party has supplied the trial court with factual data needed in order to engage in the balancing process required to resolve the issue of "undue oppressiveness".

The State asserts that, under CR 12(b)(6), dismissal was proper because Powers cannot show under any state of facts that he was unconstitutionally denied a vested right, as the police power properly prevents him from building residences in the Skagit River floodway. However, this argument fails if Powers can demonstrate that he is entitled to categorical treatment under *Lucas*. In any event, the State's argument does not resolve Powers' due process claim. Because the undue oppressiveness issue remains unresolved, the State is not entitled to a dismissal of Powers' due process claim under CR 12(b)(6).

To conclude, we remand this case for a determination of whether categorical treatment under *Lucas* is appropriate for Powers' claim. If it is not, then we hold that, under *Presbytery*, the regulations at issue here are insulated from a takings challenge. We also remand for further proceedings on the question of whether the regulations violate Powers' substantive due process rights.

Judgment reversed.

COLEMAN, J., concurs.

GROSSE, C.J. (concurring) — I concur in the majority opinion, but question whether it is necessary to view *Lucas*[4] as a prethreshold inquiry. First, if one equates a denial of all economically viable use of property as an infringement of

---

[4] *Lucas v. South Carolina Coastal Coun.*, ___ U.S. ___, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992).

a fundamental right of ownership then it follows that the *Presbytery*[5] "threshold inquiry" has been satisfied and one moves to the second part of this State's taking inquiry. As to this second part, where a denial of all economically viable use is involved, *Lucas* dictates that the "legitimate state interests" of *Presbytery* be those that can be equated to common law nuisance theory. To this extent *Lucas* requires a reexamination of a portion of *Presbytery.*

On the other hand, where the challenge is not a facial challenge but one pertaining to specific property, then it seems to me that the *Presbytery* analysis should apply, assuming that our Supreme Court intended that analysis to allow compensation in circumstances where there is less than a loss of all viable economic use.

In any event, my observations have no impact on the decision in this case and until our Supreme Court is faced with a situation requiring it to examine its taking analysis in light of *Lucas*, it may well be that the majority's approach is the most practical.

Reconsideration denied October 1, 1992.

---

[5]*Presbytery of Seattle v. King Cy.*, 114 Wn.2d 320, 787 P.2d 907, *cert. denied,* 498 U.S. 911, 112 L. Ed. 2d 238, 111 S. Ct. 284 (1990).