[No. 29863-9-III.   Division Three.   February 2, 2012.]

ELIZABETH CRADDUCK, *Respondent*, v. YAKIMA COUNTY ET AL., *Appellants*.

*James P. Hagarty, Prosecuting Attorney,* and *Paul E. McIlrath, Deputy,* and *Robert M. McKenna, Attorney General,* and *Thomas J. Young, Assistant,* for respondent.

*Sara L Watkins* (of *Velikanje Halverson PC*), for respondent.

¶1 Sweeney, J. — A county's reasonable restrictions on development that are calculated to avoid property damage and injury in a designated floodplain do not violate the landowner's right to substantive due process of law. Here, the county of Yakima included a mobile home park in a floodplain based on a history of recent flooding in the area. The effect was to prohibit replacement of mobile homes in the park for those destroyed or otherwise removed. We conclude that this was a proper exercise of police power, and that the park owner's right to substantive due process was not violated. We reverse a decision of the superior court, which concluded that the regulation was unduly oppressive and therefore violated the park owner's right to substantive due process.

## FACTS

### HISTORY OF FLOODPLAIN MAPPING IN YAKIMA COUNTY

¶2 Chapter 16A.05.20 of the Yakima County Code (YCC) regulates flood hazard areas. It incorporates by reference FEMA's[1] 1984 and 1998 "Flood Insurance Study for the Unincorporated Areas of Yakima County, FEMA Flood Insurance Risk Map" (Map), flood boundary maps, floodway maps, and any amendments to those documents. YCC 16A.05.20.010.

¶3 The 1985 Map is one of those FEMA documents incorporated by reference into the YCC. That Map was drawn after FEMA conducted a "non-detailed" study from 1976 to 1978. It put Sun-Tides Mobile Home Park in the floodplain, but not in the floodway. A "floodplain" is "a flat or nearly flat surface that may be submerged by floodwaters." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 873 (1993). A "floodway," which is within a floodplain, is "the channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than one foot." WAC 173-158-030.

¶4 It became clear in 1996 that the 1985 Map needed revision. The Naches River bank is steep and that causes water to travel at high velocities and that, in turn, caused the river to change paths during several floods that occurred after FEMA issued the 1985 Map. A February 1996 flood was a 50-year flood. Indeed, that flood exceeded the 100-year floodplain boundaries and, in some places, exceeded the 500-year floodplain boundaries. In Ramblers Park, an area just outside of Gleed and off State Route 12, 10 families had to evacuate and businesses were shut down for more than a month after the February 1996 flood. That flood caused nearly $4.2 million in damages, including

---

[1] Federal Emergency Management Agency.

$200,000 in private losses. It affected 55 businesses and 240 individuals. The flood caused the Naches River's channel to move and widen. A May 1997 flood also caused the river's channel to change.

¶5 FEMA began a "[m]ap [m]odernization initiative" in 2004 and completed the initiative in 2008. This was a detailed study that reevaluated area streams and topography. Yakima County issued the "Naches River Comprehensive Flood Hazard Management Plan" (Comprehensive Plan) as part of the initiative. One of the goals was to better understand the Naches River system and to promote public safety. The plan recommended that the Map be updated to include areas where there is faster and deeper water and to "[c]reate a hydraulic model of the river to predict flood heights and areas of inundation." Clerk's Papers (CP) at 258. The Comprehensive Plan also recommended that the county try to limit development in the floodplain to include prohibiting creation of new lots in the floodplain, buying out landowners in the Ramblers Park area, and encouraging existing landowners to keep their land undeveloped.

¶6 FEMA completed a new Map on November 18, 2009. The engineering firm responsible for the Maps used modern modeling methods, studied more cross-sections than the pre-1985 study, and used the area's more recent floods as tools for calibrating the model. This Map expanded the floodway to include Sun-Tides.

SUN-TIDES MOBILE HOME PARK AND THE BUILDING PERMIT APPLICATION

¶7 Elizabeth Cradduck owns Sun-Tides Mobile Home Park. Her parents were Sun-Tides' previous owners. Sun-Tides is in Gleed, just off State Route 12 and near the Naches River. It is 7.3 acres and contains 57 lots. Each lot rents for $315 per month. It would seem that this brings a gross income of $17,955. But Ms. Cradduck says that her gross income is actually $17,010 per month. CP at 392. Sun-Tides has an assessed value of $1,312,900, $1,097,600

of which represents improvements. Almost every lot in Sun-Tides contains a mobile home that is kept as a permanent, stationary home. The people who live in Sun-Tides are generally elderly or on a fixed income. Living in a mobile home park is affordable for those who want the benefits of home ownership but who cannot afford a traditional home or land. However, these mobile homes have a limited life span.

¶8 Lillian Williams lived on lot 17 in a mobile home she owned. Ms. Williams abandoned her mobile home on October 27, 2009. Her home was in disrepair and Ms. Cradduck had it destroyed.

¶9 Lot 17 was then vacant in the spring of 2007. Lloyd Johnson, through Gato's Construction LLC, applied that spring for a construction permit that would allow him to put a used mobile home on lot 17. David Saunders is a Yakima County building official; he reviewed the application. And he consulted the floodplain management specialist for the Department of Ecology program, Charles L. Steele. Mr. Steele concluded that Sun-Tides was in the floodway and that RCW 86.16.041 (floodplain management ordinances) prohibited new residential construction in floodways. Placement of a manufactured home is considered new construction. He denied the application for the permit and so advised Mr. Saunders on May 26, 2010. Mr. Saunders also advised Ms. Cradduck by letter dated May 26, 2010 that the permit had been denied and that his decision was final for purposes of the Land Use Petition Act (LUPA), ch. 36.70C RCW.

¶10 Ms. Cradduck petitioned Yakima County Superior Court to review Mr. Saunder's decision under LUPA. She argued, among other things, that the decision was a regulatory taking and violated her rights to substantive due process. The court rejected the regulatory taking claim but concluded that Ms. Cradduck had been denied her right to substantive due process. Specifically, the court held (1) there was a legitimate purpose for the floodway statutes, (2)

whether the statutes used reasonably necessary means to achieve their purpose was "debatable," and (3) the statutes were unduly burdensome to Ms. Cradduck. CP at 512. The trial court also concluded that there were no economically viable uses left for the land and that "[b]ecause of the obvious economic impact," the county should have allowed Ms. Cradduck to provide evidence and a risk assessment to Mr. Saunders. CP at 503. And the court concluded that Mr. Saunders should have determined whether Ms. Cradduck had vested rights or nonconforming use rights in the property. The court then reversed Yakima County's denial of the permit. Yakima County and the Department of Ecology appeal.

## DISCUSSION

Substantive Due Process Rights—Flood Control Regulations

¶11 The superior court judge ruled that the regulations here were unduly oppressive to the extent that they violated Ms. Cradduck's rights to substantive due process of law. CP at 503. The county and the Department of Ecology contend that this is wrong as a matter of law. Our review is de novo. *HJS Dev., Inc. v. Pierce County*, 148 Wn.2d 451, 468, 61 P.3d 1141 (2003).

¶12 State law requires that county flood management ordinances meet certain standards. It requires that "[t]he basis for state and local floodplain management regulation shall be the areas designated as special flood hazard areas on the most recent maps provided by [FEMA] for the national flood insurance program." RCW 86.16.051. State law also requires that counties restrict construction and replacement of houses

except for: (i) Repairs, reconstruction, or improvements to a structure which do not increase the ground floor area; and (ii) repairs, reconstruction, or improvements to a structure the cost of which does not exceed fifty percent of the market value of the structure either, (A) before the repair, reconstruction, or repair

is started, or (B) if the structure has been damaged, and is being restored, before the damage occurred. Any project for improvement of a structure to correct existing violations of state or local health, sanitary, or safety code specifications that have been identified by the local code or building enforcement official and which are the minimum necessary to ensure safe living conditions shall not be included in the fifty percent determination.

RCW 86.16.041(2)(a).

¶13 Yakima County's flood management ordinance meets both these standards. It designated "flood hazard areas" based on 1998 and 1984 FEMA Maps, and amendments to those Maps. YCC 16A.05.20.010. Yakima County also adopted RCW 86.16.051's restrictions on floodway construction. Yakima County prohibits

[c]onstruction or reconstruction of residential structures within designated floodways, except for (i) repairs, reconstruction, or improvements to a structure which do not increase the ground floor area; and (ii) repairs, reconstruction or improvements to a structure, the cost of which does not exceed fifty percent of the assessed value of the structure either (A) before the repair, reconstruction or improvement is started, or (B) if the structure has been damaged and is being restored, before the damage occurred.

YCC 16C.05.36.020(3).

¶14 Yakima County and the Department of Ecology argue that Yakima County did not apply these laws in a way that violated Ms. Cradduck's substantive due process right. "The touchstone of due process is protection of the individual against arbitrary [government] action[s]," whether in denying fundamental procedural fairness (procedural due process) or in exercising power arbitrarily, without any reasonable justification in the service of a legitimate government interest (substantive due process). *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998). "Substantive due process protects against arbitrary and capricious government action even when the

decision to take action is pursuant to constitutionally adequate procedures." *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 218-19, 143 P.3d 571 (2006). In other words, a government action denies a person their substantive due process right if the police power has exceeded its constitutional limits. *Presbytery of Seattle v. King County*, 114 Wn.2d 320, 330, 787 P.2d 907 (1990). We apply a three-pronged analysis to decide whether a land use decision violates substantive due process. *Id.* This analysis asks:

1. "[W]hether the regulation is aimed at achieving a legitimate public purpose." *Id.*

2. "[W]hether it uses means that are reasonably necessary to achieve that purpose." *Id.*

3. "[W]hether it is unduly oppressive on the land owner." *Id.*

We address each of these factors in order.

I. Whether the regulation is aimed at achieving a legitimate public purpose.

¶15 Municipal zoning ordinances are generally constitutional if they "tend[ ] to promote the public health, safety, morals or welfare." *Duckworth v. City of Bonney Lake*, 91 Wn.2d 19, 26, 586 P.2d 860 (1978) (addressing facial challenge to ordinance banning mobile homes and holding ordinance was constitutional). Preventing flood damage is most certainly a legitimate public purpose. In the takings and exactions context, the United States Supreme Court commented that "[u]ndoubtedly, the prevention of flooding along [a creek] qualif[ies] as the type of legitimate public purpose[ ] we have upheld." *Dolan v. City of Tigard*, 512 U.S. 374, 387, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994). But statutes aimed at preventing or controlling flood damage have yet to be addressed in the substantive due process context.

¶16 Like the United States Supreme Court, this state has also reviewed these statutes in the takings context. The

Department of Ecology relies on two such cases to show that the statutes at issue achieve a legitimate public purpose. *Powers v. Skagit County* applies a takings and substantive due process analyses. 67 Wn. App. 180, 835 P.2d 230 (1992). But there the landowner conceded that floodway regulations were aimed at achieving a legitimate public purpose. *Id.* at 193. So the case is not helpful here.

¶17 The other case relied upon by the Department of Ecology is *Maple Leaf Investors, Inc. v. Department of Ecology*, 88 Wn.2d 726, 565 P.2d 1162 (1977). That was a takings case, but its analysis is helpful. The petitioners in *Maple Leaf* challenged former WAC 508-60-040 (1974), which gave the Department of Ecology authority to prohibit construction of buildings designed for " 'human habitation of a permanent nature' " in floodways. *Id.* at 730 (quoting former WAC 508-60-040(4)). The court saw the takings analysis as "balancing the public interest in regulating the use of private property against the interests of private landowners not to be encumbered by restrictions on the use of their property." *Id.* at 731. In looking at the public interest side of that balancing test, the court looked at whether the statute delegating authority to the Department of Ecology—chapter 86.16 RCW—was a valid exercise of police power, and, in doing so, discussed those considerations underlying police power:

> "[Police power] has been defined as an inherent power in the state which permits it to prevent all things harmful to the comfort, welfare and safety of society. . . . It is exercised for the benefit of the public health, peace and welfare. . . . [P]olice power regulates its use and enjoyment, or if it takes or damages it, it is not a taking or damaging for the public use, but to conserve the safety, morals, health and general welfare of the public."

*Id.* at 732 (emphasis omitted) (quoting *Conger v. Pierce County*, 116 Wash. 27, 35-36, 198 P. 377 (1921)). The court in *Maple Leaf* also considered the purpose of chapter 86.16 RCW—"[t]he alleviation of recurring flood damages to

public and private property, to the public health and safety."
Former RCW 86.16.010 (1935). The purpose of chapter
86.16 RCW was the same as the purposes underlying the
public interest side of the takings balancing test—health,
safety, and welfare.

¶18 RCW 86.16.010 remains largely unchanged. *Compare* RCW 86.16.010, *with* former RCW 86.16.010 (1935).
And the goals remain the same—to prevent damage to
private property and to protect public health and safety. So
chapter 86.16 RCW and chapter 16A.05.20 YCC support
legitimate public purposes.

II. Whether the regulation uses means that are reasonably
necessary to achieve that purpose.

¶19 The "reasonably related" standard is modest. *See
generally Duckworth*, 91 Wn.2d at 26-27; *Presbytery*, 114
Wn.2d at 330. It simply asks whether regulations tend to
solve a public problem. *Presbytery*, 114 Wn.2d at 330. And
the way the legislature chose to solve the problem at hand
is not unreasonable just because the legislature could have
solved the problem some other way. *Christianson v. Snohomish Health Dist.*, 133 Wn.2d 647, 946 P.2d 768 (1997).

¶20 Here, the statutes at issue tend to solve the public
problem of reoccurring flood damage to private property
with its attendant risk to public health and safety. Chapter
86.16 RCW requires that local land use ordinances restrict
land uses in floodways by prohibiting "construction or
reconstruction, repair, or replacement of residential structures" except for in limited circumstances. RCW 86.16-
.041(2)(a). YCC 16A.05.36.020(3) mirrors RCW 86.16.041's
requirements. Prohibiting new residences from being built
and prohibiting repairs to residences that are more than 50
percent destroyed in floodways tends to solve the problem
of flood damage. This is because there will be less reoccurring flood damage to private property if there are fewer
people living in homes in the floodway.

¶21 Further, the adoption of the latest Map tends to
address the problem of injury and damage caused by floods.

After several floods, it became clear that the 1985 Map did not accurately represent the Naches River's floodway. New information was used and new scientific methods were applied to update the Map. The result was a more accurate forecast of areas at risk for flooding. So chapter 86.16 RCW, chapter 16A.05.20 YCC, and adoption of the 2009 Map all tend to solve the problem of flood damage to private property and to protect public health and safety.

III. Whether the regulation is unduly oppressive on the landowner.

¶22 The third prong of the substantive due process analysis "will usually be the difficult and determinative one." *Presbytery of Seattle*, 114 Wn.2d at 331. The third prong contains an implicit balancing test that weighs the public interest against the landowner's interest. *Id.* Our Supreme Court has suggested nonexclusive factors to aid in this balancing test. The factors on the public side of the balancing test are:

- "the seriousness of the public problem,"
- "the extent to which the owner's land contributes to it,"
- "the degree to which the proposed regulation solves it and"
- "the feasibility of less oppressive solutions."

*Id.* The factors on the owner's side of the balancing test are:

- "the amount and percentage of value loss,"
- "the extent of remaining uses,"
- "past, present and future uses,"
- "temporary or permanent nature of the regulation,"
- "the extent to which the owner should have anticipated such regulation and"
- "how feasible it is for the owner to alter present or currently planned uses."

*Id.*

¶23 Both the county and the Department of Ecology distinguish the facts here from other cases where the courts have held that regulations unduly oppressed a landowner. Br. of Dep't of Ecology at 16-17; Br. of Yakima County at 11-13. Where the courts have held that a regulation was unduly oppressive, the regulation shifted the cost of a public policy to a private landowner. *See Guimont v. Clarke*, 121 Wn.2d 586, 611-13, 854 P.2d 1 (1993) (holding that statute requiring mobile home park owners to pay relocation costs of tenants when park closes was unduly oppressive); *Sintra, Inc. v. City of Seattle*, 119 Wn.2d 1, 22, 829 P.2d 765 (1992) (holding that enforcement of ordinance that required property owners who were converting low income housing to other uses to pay a substantial fee was unduly oppressive). In contrast, the Supreme Court has held that regulations were not unduly oppressive when the regulations targeted a particular behavior or condition that contributed to a public problem. *See Christianson*, 133 Wn.2d at 664-66 (holding that regulation requiring that those who add onto their homes to update their septic system to meet current code requirements was not unduly oppressive); *Weden v. San Juan County*, 135 Wn.2d 678, 707, 958 P.2d 273 (1998) (holding that ordinance banning motorized personal watercrafts on marine waters and on one lake was not unduly oppressive). The petitioners argue that this case is akin to those in which problem activities or conditions were regulated.

¶24 The Supreme Court has also concluded that it is not inherently unduly oppressive to stop nonconforming uses. *Christianson*, 133 Wn.2d at 663. Indeed, it is against public policy to allow " 'the indefinite extension of nonconforming uses. The public effort is not to extend a nonconforming use but rather to permit it to exist as long as necessary and then to require conformity in the future. Indeed, the public intent is the eventual elimination of nonconforming uses.' " *Id.* (quoting *Coleman v. City of Walla Walla*, 44 Wn.2d 296,

300, 266 P.2d 1034 (1954)). Nonconforming uses are allowed to continue " 'only to avoid injustice.' " *Id.* (quoting *Coleman,* 44 Wn.2d at 300). Accordingly, "it is clear that local governments have the authority to preserve, regulate and even, within constitutional limitations, terminate nonconforming uses." *Rhod-A-Zalea & 35th, Inc. v. Snohomish County,* 136 Wn.2d 1, 8, 959 P.2d 1024 (1998). While it would be unconstitutional to subject nonconforming uses to "immediate termination," it is a valid exercise of police power to terminate nonconforming uses that have been abandoned or by providing "a reasonable amortization period." *Id.* at 8-10.

### A. On the Public Side

¶25 Flood damage in this area is a serious problem. The February 1996 flood forced people from their homes, closed businesses, and cost government and private parties a lot of money. This factor weighs in the public's favor.

¶26 Whether Sun-Tides and lot 17, in particular, contribute to the flooding problem depends on how the scope of the problem is viewed. Unlike in *Guimont* and *Sintra,* Sun-Tides did not cause conditions that in turn caused the problem. *See Guimont,* 121 Wn.2d at 611-13; *Sintra,* 119 Wn.2d at 22. Of course, Sun-Tides cannot cause flooding. However, if the Naches River flooded again, Sun-Tides would contribute to the problems associated with flooding. Lot 17 is one of 57 lots that had permanent residents. So, there are 56 families in Sun-Tides that could be affected by property loss, and the safety and health risks associated with flooding. Sun-Tides' residents are generally elderly or have low income. The elderly would be especially affected by the health and safety risks of a flood and the low income residents would be especially affected by the property losses that could result from a flood. Continued use of the lot then does contribute to the problems chapters 86.16 RCW and 16A.05.20 YCC were passed to address. This factor then weighs in the public's favor.

¶27 The regulations at issue here also tend to solve the problem at hand with a minimum of impact on the land-owner. The regulations limit development in the floodway. The clearest way to prevent flood damage would be to force out those who live or work in the floodplain. Chapter 86.16 RCW does not do that. It allows structures already in place to be repaired and improved as long as the structure's ground floor area is not increased and as long as the improvements' value is less than 50 percent of the structure's value. RCW 86.16.041(2)(a). This seems to us reasonable in light of the legislature's ability to amortize noncon-forming uses consistently with the public policy of discouraging nonconforming uses. Again, this factor weighs in the public's favor.

## B. On the Owner's Side

¶28 Ms. Cradduck can no longer rent lot 17; her rental income is reduced. There are 56 lots that rent for $315 per lot. Her gross income of $17,010 is then decreased by $315 per month. We conclude that this immediate impact is modest. But certainly there is the potential that as mobile homes leave Sun-Tides, Ms. Cradduck's income and the value of her land would decrease more. However, Sun-Tides can continue to operate as a mobile home park for an indefinite period of time. This factor weighs against Ms. Cradduck.

¶29 The land was used as a mobile home park before Ms. Cradduck owned it. What the land was used for before that is not in this record. Currently, the land is used as a mobile home park and Ms. Cradduck plans to continue this use. If Ms. Cradduck were to stop operating the mobile home park, the other uses for the land are limited by the floodway building restriction. The remaining available uses—those that do not require new buildings—appear to be agricul-tural or outdoor recreational. However Ms. Cradduck can continue to use the land as a mobile home park; so this factor also weighs against her.

¶30  Converting Sun-Tides to a different use probably is not feasible, but Ms. Cradduck is not being asked to convert it to a different use. Again, Ms. Cradduck would probably be limited to agricultural or recreational uses. Ms. Cradduck would probably have to go to considerable expense tearing out driveways, parking pads, and the like to engage in these uses. Nonetheless, Ms. Cradduck can continue to use the land as a mobile home park for many years to come. She is prevented only from bringing in new mobile homes to replace old ones. Again, this factor weighs against Ms. Cradduck.

¶31  The regulations here are permanent. Chapter 86.16 RCW has been in effect, with various changes, since 1935. Although the Map changes from time to time, the last time 24 years went by before the 1985 Map was updated. It seems unlikely that the restrictions will be lifted or that the Map will be updated to put Sun-Tides outside of the floodway. For those reasons, this factor seems to weigh in Ms. Cradduck's favor.

¶32  There is little in the record that addresses whether Ms. Cradduck could have anticipated the floodway regulations. Considering the flood damage to Ramblers Park, which is just down State Route 12 and across the Naches River from Sun-Tides, the 2009 Map amendments putting Sun-Tides in the floodway should not have been a complete surprise. But the only thing in this record showing that Sun-Tides had a history of flooding was Mr. Steele's personal knowledge that the Sun-Tides area flooded in 1996. And Sun-Tides does not directly border the Naches River. This factor weighs in Ms. Cradduck's favor.

C. Whether the Floodway Restrictions are Unduly Oppressive.

¶33  The restrictions here are not unduly oppressive when we weigh the public's interest against Ms. Cradduck's. Chapter 86.16 RCW and chapter 16A.05.20 YCC protect the public against a serious threat on one hand, while trying to mini-

mize burdens to floodway landowners on the other hand. And while these regulations may, theoretically, require Ms. Cradduck to give up the mobile home park business one day, that day may never come. In the meantime, Ms. Cradduck can continue to operate Sun-Tides and she is losing only some income due to the floodway construction prohibition. Furthermore, as the county and the Department of Ecology point out, Ms. Cradduck is not being required to directly pay for a public problem in a monetary sense. Rather, she is required to limit an activity that will likely contribute directly to a public problem.

¶34 Finally, the county's police power to discontinue nonconforming uses informs our analysis here. If it is reasonable to prohibit the continuance of nonconforming uses after abandonment or amortization, then it seems similarly reasonable to prevent nonconforming uses from being newly constructed. Because these prohibitions pass all three prongs of the substantive due process test, the court below erred in overturning Yakima County's denial of the building permit at issue here.

¶35 We reverse the judgment of the superior court.

KULIK, C.J., and KORSMO, J., concur.