244 P.3d 412 (2010)
BAYFIELD RESOURCES COMPANY, Appellant,
v.
WESTERN WASHINGTON GROWTH MANAGEMENT HEARINGS BOARD, Thurston County, Adams Cove Group, and Future Wise, Respondents.
No. 39411-1-II.
Court of Appeals of Washington, Division 2.
September 28, 2010.
As Amended on Grant of Reconsideration in Part and Granting Motion to Publish September 28, 2010.
Publication Ordered December 2, 2010.
*413 Eric Samuel Laschever, Stoel Rives LLP, Jason T. Morgan, Attorney at Law, Seattle, WA, for Appellant.
Martha Patricia Lantz, City of Tacoma Office of the City Attorney, Tacoma, WA, Jerald R. Anderson, Attorney at Law, Attorney Generals Office, Olympia, WA, for Defendant.
Jeffrey George Fancher, Attorney at Law, Olympia, WA, for Respondents.
HUNT, J.
¶ 1 Bayfield Resources Company appeals the Thurston County Superior Court's denial of its petition for review of the Western Washington Growth Management Hearings (GMH) Board's decision rejecting its petition to invalidate the Critical Areas Amendment under Thurston County Ordinance No. 13884, which excludes "certain critical areas," I Administrative Record (AR) at 23, from the required density calculation for Rural Residential R-1/5 (one-dwelling unit per five acres) lands, including portions of Bayfield's 700-acre property.[1] Bayfield argues that (1) the superior court erred in concluding that the Critical Areas Amendment did not violate substantive due process; (2) the GMH Board erroneously interpreted and applied Goal No. 6 of the Growth Management Act (GMA), Chapter 36.70A RCW; and (3) substantial evidence does not support the GMH Board's decision. We affirm the superior court's denial of Bayfield's substantive due process claim, and we affirm the GMH Board's denial of Bayfield's petition to invalidate the County zoning code's Critical Areas Amendment.

FACTS

I. Planned Rural Residential DevelopmentResource Protection Easements
¶ 2 Bayfield Resources Company owns approximately 700 acres of undeveloped property near Gull Harbor and Boston Harbor Road in Thurston County's "Rural Residential-One Dwelling Unit per Five Acres" zoning district. See Chapter 20.09 Thurston County Code (TCC). A portion of this property falls within the County's "critical areas" designation, which restricts development and imposes various land use and conservation *414 requirements. II AR at 456 (official zoning map).
¶ 3 In August 2002, Bayfield contacted the Thurston County Planning Department, asking about creating "resource protection easements" and subdividing portions of its property as a Planned Rural Residential Development (PRRD), using the easements as all or part of the PRRD's required "resource use parcel."[2] II AR at 500. The Planning Department replied by letter that the Code permits resource protection easements "to serve as all or part" of a resource use parcel. II AR at 500; see TCC 20.30A.040.

II. Procedure

A. Growth Management Act Compliance
¶ 4 In July 2005, the GMH Board found that the County's zoning scheme failed to comply with the Washington State Growth Management Act because it did not provide for a variety of rural densities as RCW 36.70A.070(5)(b)[3] requires. The GMH Board imposed a compliance schedule that required the County to amend its zoning code to "provide for a variety of rural densities" in compliance with RCW 36.70A.070(5)(b). Clerk's Papers (CP) at 120.

1. Public input on density rezone proposal
¶ 5 As part of its compliance effort, the County Planning Commission conducted open houses and workshops to receive public input about lands appropriate for density rezoning, held public meetings, and posted an online forum for public comment on the preliminary rezone proposals. In 2006, the Planning Commission revised the rezone proposals based on the public's response.
¶ 6 In early 2007, the Planning Commission submitted majority and minority rezone proposals to the Board of Commissioners, with a Staff Report comparing and contrasting the two proposals. In discussing whether to include a "[r]ezoning [provision] to [p]rotect [p]articular `[a]t [r]isk' [g]eographic [a]reas," the Staff Report noted that both proposals agreed on the following "reasoning":
Rezoning the Salmon Creek Basin would result in fewer homes being built in an area at risk of flooding from surfacing groundwater. Rezoning lands along the Nisqually Bluff would reduce the potential number of dwellings put at risk due to possible slope failure in that area. This reduction in allowed dwelling units coupled with the proposed reductions in maximum impervious surface allowances, would likely result in less stormwater generation and reduce the risk of slope failure. The Black River Corridor contains multiple wetlands and riparian areas that support wildlife; rezoning will help preserve this area.
III AR at 797.
¶ 7 The Board of Commissioners asked the County to prepare a "Critical Areas Innovative Technique" (Innovative Technique) proposal for the public to review in addition to the rezone proposal. I AR at 34. In identifying the rezone area, the County focused on lands physically constrained or hazardous to develop and lands of high habitat and environmental service value. The County provided maps delineating these areas, which it presented with other materials for public review. The public workshop groups prioritized the lands for rezone as those consisting of unbuildable lands, hazardous lands, wetlands, geographically sensitive areas, and conservation areas.

2. Innovative technique
¶ 8 During these public workshops, the Planning Commission discussed the idea of adopting an Innovative Technique to provide for a greater "variety of rural densities while leaving the rural zoning density unchanged." *415 III AR at 1015. The Planning Commission proposed three variations of this Innovative Technique, under which the County would (1) "exclude certain critical areas* from the density calculation," (2) "exclude certain critical areas* and [half] of the associated buffer from the density calculation," or (3) "exclude certain critical areas* and the entire associated [critical area] buffer." III AR at 1015 (emphasis omitted). The asterisks explained that the following critical areas would be excluded from the density calculation: "[R]ivers and streams up to the ordinary high water mark, 100-year floodplains, high ground water hazard areas, wetlands, landslide hazard areas, marine bluffs, oak stands and prairie defined and protected under Chapter 17.15" III AR at 1015.
¶ 9 The Planning Commission identified some of the benefits of adopting an Innovative Technique as follows:
1. The approach would result in less density in areas near sensitive critical areas, which may, in some cases, reduce cumulative impacts to the critical areas.
2. The proposal provides an objective and innovative way to effectively achieve a variety of rural densities.
3. The proposal could be combined with a transfer of development rights program and/or clustering proposal to lessen its impact on affected property owners.
III AR at 1016. The Planning Commission estimated that an Innovative Technique "would result in a reduction of the allowed density and/or number of lots." III AR at 795. It also noted that an Innovative Technique did not change the current zoning designation of Thurston County's "One-Dwelling Unit per Five Acres" rural lands. TCC Chapter 20.09.

B. Bayfield's Opposition
¶ 10 In July 2007, after learning that the County planned to adopt an Innovative Technique, Bayfield wrote a letter to the Board of Commissioners, asserting that (1) its "several hundreds of acres of lands currently zoned at 1 unit/5 acres [] would be adversely affected," II AR at 472; and (2) the "critical areas regulations alone protect the resources," rendering any additional regulation unnecessary to protect the area. II AR at 474. Bayfield asked the Board of Commissioners to provide an additional opportunity for public comment.
¶ 11 Following a Board of Commissioners' meeting on the Planning Commission's rezone proposals, Bayfield again contacted the Board of Commissioners by letter. Noting that "the Board appears to be moving towards combining the `Innovative [Technique] Proposal,'" III AR at 723, with portions of its majority and minority density rezone proposals, Bayfield opposed "[c]ounty-wide application of the Innovative [Technique] Proposal," III AR at 724, contending that the proposal would limit Bayfield's ability to subdivide without benefitting the County's rural environment.
¶ 12 In reviewing the Planning Commission's revised rezone and Innovative Technique proposals, the Board of Commissioners noted that the benefits of rezoning included protecting drinking water supplies, avoiding natural hazards, protecting lands supporting family farms and forestry, preserving the "rural character" of rural lands, increasing visible open space, retaining wildlife habitat, and protecting shellfish. II AR at 560. Following two more Board of Commissioners' meetings on these proposals, Bayfield opposed the proposed rezone's exclusion of "certain critical areas," I AR at 23, from the density calculation for rural properties. Bayfield asserted that the proposal was "fundamentally arbitrary," II AR at 503, and that the County zoning code's critical areas regulations "already adequately protected," II AR at 504, the areas to which it would apply.

C. County Adoption of Ordinance No. 13884 and Resolution No. 13885
¶ 13 On August 20, 2007, the County adopted a revised rezone proposal to provide a greater variety of rural densities by repealing Chapter 20.08, Agricultural District, Ordinance No. 13884 and Resolution No. 13885, and by adding three new chapters to the County zoning code: (1) 20.09B, Rural-One Dwelling Unit per Twenty Acres (R 1/20); (2) 20.09C, Rural-One Dwelling Unit per Ten Acres (R 1/10); and (3) 20.09D, Urban Reserve-One Dwelling Unit per Five Acres *416 (UR 1/5). The County also amended its Official Zoning Map and its zoning code regulations under chapter 20.09 TCC and its critical areas regulations under Chapter 17.15 TCC. Ordinance No. 13884 became effective on August 27, 2007.
¶ 14 The Ordinance amended the County's zoning designations by requiring Rural Residential Resource and Rural Residential properties to provide "the maximum number of dwelling units"[4] per acre by subtracting, for density calculation purposes, "documented critical areas, including wetlands, landslide hazard areas, and high groundwater areas but not buffers for these types of areas," and then calculating the density based on the remainder of the property. CP at 19-20. The Ordinance provided that the new zoning designations would "reduce development in environmentally sensitive and hazardous areas... thereby helping to protect public health, safety and welfare." I AR at 23.
¶ 15 For critical areas, the Ordinance provided:
[T]he amendments to Section 17.15.335 Critical Areas, require the exclusion of certain critical areas from the density calculations for subdivision purposes in the Rural Residential-One Dwelling Unit per Five Acres District (RR1/5) and the Rural Residential Resource-One Dwelling Unit per Five Acre District (RRR1/5), thus providing for additional variety of densities throughout the rural county.
I AR at 23.

D. Bayfield's Petition for Review to the GMH Board
¶ 16 In October 2007, Bayfield filed a petition for review with the GMH Board, asking it to invalidate the Critical Areas Amendment[5] to the County zoning code, "implemented through Resolution No. 13885 and Ordinance No. 13884." I AR at 2. The GMH Board consolidated Bayfield's petition for review with a separate petition for review from a different party, Futurewise, "because both [petitions] challenged the same enactment." CP at 13. Bayfield asserted that (1) the County's "unreasonable and arbitrary," I AR at 184, adoption of the Innovative Technique "violates [GMA] Goal [No.] 6," I AR at 184; (2) the County "has failed to justify this new pattern of development" for critical areas, I AR at 184; (3) the County denied the public an opportunity to comment on the revised rezoning proposals, and (4) "these errors" support a determination of the critical areas amendment's invalidity. I AR at 184.
¶ 17 In response, the County asserted that (1) the Critical Areas Amendment "protect[s] critical/sensitive areas and the wildlife found within such areas," II AR at 545; (2) the County Planning Commission's Staff Report and the associated public testimony "made it clear that lower densities in areas near sensitive critical areas will provide benefits," II AR at 545; (3) "it is self evident that the innovative technique will mean less development near critical areas, more open space around critical areas, more wild life habitat around critical areas, and more trees and vegetation around critical areas," II AR at 545; (4) "appl[ying] [] the innovative technique will result in a development pattern that follows the flow of the natural landscape, with less development occurring in areas with an abundance of physical features that are environmentally sensitive," II AR at 547; and (5) the County's "approach provides additional open space and limits the amount of impervious surfaces surrounding environmentally sensitive areas, conserves wildlife habitat in the rural area and provides additional protection for the environment in the County's highest density rural district where such protection is most appropriate." II AR at 549.
¶ 18 At the GMH Board hearing, Bayfield reiterated its argument that (1) the Critical *417 Areas Amendment failed to provide for "meaningful continuous public participation," Agency Transcript (AT) at 8, and to comply with GMA Goal No. 6; and (2) the County failed to base the Critical Areas Amendment's Innovative Technique on the best available science. Noting that Bayfield's property lies within the rural area "referr[ed] to in the course of public comment as unbuildable lands," AT at 85, the GMH Board asked Bayfield if it "claim[ed] to have a property right to be able to develop the property at it's(sic) current zoning." Bayfield replied, "No." AT at 85. The GMH Board asked the County whether a property owner would still be able to build a house on a parcel containing 65 percent critical areas. The County responded, "That's correct." AT at 84. The GMH Board asked the County whether it "would [ ] be fair" to refer to such a property as "unbuildable lands." The County agreed, "That's fair." AT at 85. Bayfield did not object to these characterizations.

E. GMH Board Decision
¶ 19 On April 17, 2008, the GMH Board issued its final decision and order on Bayfield's petition for review, concluding that (1) Bayfield had "failed to carry its burden of proof to demonstrate that the County's innovative technique results in inappropriate rural densities and uses or that it will produce growth inconsistent with rural character," CP at 46, Conclusion of Law (CL) F; (2) "Bayfield has not established the arbitrary or discriminatory nature of the County's Critical Areas Innovative Technique or otherwise proven a violation of [GMA] Goal [No.] 6," CP at 46, CL G; and (3) "[a]bsent a finding of noncompliance with any provision of the GMA, there is no basis for a determination of invalidity." CP at 46, CL H.

1. Consistency with rural character
¶ 20 The GMH Board rejected Bayfield's argument that the Critical Areas Amendment "would result in a pattern of development that does not reflect appropriate rural densities or development that is consistent with [its] rural character." CP at 35. The GMH Board reasoned that (1) the area's rural zoning designation "already denotes [its] rural character and [the County's] desire to maintain lower densities," CP at 35; and (2) the Critical Areas Amendment's deducting "certain critical areas," I AR at 23, from density calculations in the Rural Residential District achieves lower densities and a greater variety of densities than those permitted under the previous zoning code.
¶ 21 The GMH Board also concluded that the Critical Areas Amendment "would not, necessarily, create inappropriate or inconsistent rural development." CP at 35. And because "Bayfield ha[d] not raised the failure of the County to rely on BAS [the best available science] as an issue in this appeal," CP at 35, the GMH Board did not consider whether the best available science supported the Amendment.

2. Opportunity for public participation
¶ 22 The GMH Board also rejected Bayfield's argument that the County had failed to "provide meaningful continuous public participation." AT at 8. On the contrary, it determined that the Critical Areas Amendment "was clearly within the scope of the [County's] previously discussed alternatives," CP at 25, and "[t]hese alternatives were available for discussion by the public during the County's public participation program." CP at 25. The Board further noted, "That the County selected from these alternatives in drafting the final enacted version did not deprive the public of a meaningful opportunity to comment." CP at 25.

3. Compliance with GMA Goal No. 6
¶ 23 In analyzing Bayfield's argument under GMA Goal No. 6, the GMH Board noted that to succeed on this claim, Bayfield must prove that "the action taken by a local jurisdiction is both arbitrary and discriminatory" and that "the action has impacted a legally recognized right." III AR at 1100. The GMH Board determined that GMA Goal No. 6 does not protect Bayfield's ability to subdivide its critical areas property.

4. No "arbitrary and discriminatory" action
¶ 24 Finally, the GMH Board concluded, "Even if Bayfield had provided a recognized *418 property right," it failed to demonstrate that the County's action was arbitrary and discriminatory. III AR at 1100-01. Rejecting Bayfield's assertion that the County zoning code's Critical Areas Amendment is "arbitrary" because it "imposes an unjustified burden on landowners with no discernable benefit," III AR at 1101, the GMH Board concluded that the County's action in adopting the Critical Areas Amendment was not baseless and, thus, not "arbitrary" because (1) the County chose a variation of the Innovative Technique "that deducted the critical area but not the buffer as the other two variations required," III AR at 1101; (2) the County "consider[ed] that the deducted portion was unbuildable land which a property owner would [] have [no] reasonable expectation of developing," III AR at 1101; and (3) the County's approach provides additional open space, limits the amount of impervious surfaces, "conserves wildlife habitat in the rural area," and provides additional protection for "the highest density rural district." CP at 39.
¶ 25 Addressing whether the County's action was discriminatory, the GMH Board also considered whether the Amendment "unduly burdens or unfairly impacts a single group without rationale." CP at 39. The GMH Board concluded that the County adopted the Critical Areas Amendment on a rational basis because it intended for this amendment "to provide additional open space," to "limit impervious space," and to "conserve wildlife habitat in the rural areas." CP at 40.

F. Bayfield's Appeal to Superior Court
¶ 26 Under the Administrative Procedure Act (APA), Chapter 34.05 RCW, Bayfield petitioned the Thurston County Superior Court for judicial review of the GMH Board's decision. CP at 57. Bayfield asked the superior court to reverse the GMH Board because (1) the Critical Areas Amendment "unreasonably restrict[s] the use of property in violation of substantive due process protections," CP at 59; (2) the GMH Board erroneously interpreted and applied the law in determining that "Bayfield's ability to subdivide its property was not a right legally recognized," CP at 59; and (3) substantial evidence fails to support the GMH Board's decision upholding the Critical Areas Amendment because the record included no information about the Amendment's purported benefits. Bayfield also argued that the County's Critical Area Amendment violated its constitutional right to substantive due process.
¶ 27 The County responded that (1) "this zoning decision was the result of many years of litigation which ultimately required the County to make changes to its zoning code," CP at 82; (2) "the County used a reasoned approach which took into consideration lands that could not be built on due to sensitive and hazardous features," CP at 82; (3) the County provided "massive public workshops and hearings," CP at 82, during which "members of the public identified the CAIT[[6]] as its first choice," CP at 82; (4) "the County did balance the goals of the GMA, including the property rights goal ([G]oal 6), when it adopted the variation of the CAIT that provided the least amount of impact on a property owner," CP at 82; (5) providing for a variety of rural densities was "the driving force behind the ordinance and resolution," Verbatim Report of Proceedings (VRP) (Feb. 27, 2009) at 39; (6) the Critical Areas Amendment "was presented to provide a variety of densities," and "it's going to create a large variety of zoning densities in the County and, in an innovative way, that only affects properties that can't be build [sic] upon"; and (7) the Critical Areas Amendment was not unduly oppressive to property owners because they "didn't have an expectation to build" in critical areas. VRP (Feb. 27, 2009) at 41.
¶ 28 In response to Bayfield's substantive due process argument, the County asserted that Bayfield should have raised the argument in a separate appeal before the GMH Board. But the County conceded at the superior court hearing that "a constitutional challenge could not have been brought," VRP (Feb. 27, 2009) at 48, before the GMH Board *419 because it had no jurisdiction to hear constitutional issues.[7]
¶ 29 The superior court denied Bayfield's petition for review and affirmed the GMH Board's order. In its letter decision, the superior court concluded that the Critical Areas Amendment provides a greater variety of rural densities and "less density near sensitive critical areas." CP at 195. The superior court also rejected Bayfield's substantive due process claim that, because previous regulations adequately protected the County's critical areas, the Amendment was unduly oppressive. The superior court later denied Bayfield's motion for reconsideration under CR 59(a)(7) and (9).
¶ 30 Bayfield appeals.

ANALYSIS

I. Substantive Due Process
¶ 31 Bayfield first argues that the superior court erred in concluding that the County zoning code's Critical Areas Amendment did not violate substantive due process.[8] More specifically, Bayfield asserts that the Critical Areas Amendment[9] violates substantive due process because the density reductions imposed on subdivisions are not reasonably necessary and are unduly oppressive under the three-prong test articulated in Presbytery of Seattle v. King County, 114 Wash.2d 320, 330-31, 787 P.2d 907, cert. denied, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990).[10] This argument fails.
¶ 32 This argument centers on the County's compliance with the following Rural Development statute:
The rural element shall permit rural development, forestry, and agriculture in rural areas. The rural element shall provide for a variety of rural densities, uses, essential public facilities, and rural governmental services needed to serve the permitted densities and uses. To achieve a variety of *420 rural densities and uses, counties may provide for clustering, density transfer, design guidelines, conservation easements, and other innovative techniques that will accommodate appropriate rural densities and uses that are not characterized by urban growth and that are consistent with rural character.[[11]]
RCW 36.70A.070 (5)(b) (emphasis added).
¶ 33 At the outset, we note that the County zoning code's Critical Areas Amendment, codified under subsection TCC 17.15.355(B)(4)(a), does not require a property owner to subtract all critical areas from the density calculation in the Rural Residential One Dwelling Unit per Five Acres (RR 1/5) district. Instead, it requires a property owner to exclude only "certain critical areas," I AR at 23, namely sensitive and hazardous areas, from the density calculation. It provides:
Within the ... Rural Residential One Dwelling Unit per Five Acres (RR 1/5) district[ ], the maximum number of dwelling units allowed in short subdivisions, large lot subdivisions, preliminary plats, Planned Residential Developments and Planned Rural Residential Developments shall be determined by subtracting from the parcel area: documented high groundwater hazard areas, wetlands, marine bluff hazard areas to the top of the bluff, and landslide hazard areas (all protected under Chapter 17.15); all rivers, streams and marine shorelines up to the ordinary high water mark; 100-year floodplains; and submerged land of lakes. (Critical area buffers shall not be subtracted from the parcel for purposes of making the density calculation.) The zoning density will be applied to the remainder of the parcel.
TCC 17.15.355(B)(4)(a); I AR at 22 (emphasis added). Bayfield's argument obscures this distinction. And Bayfield provides incomplete information about the percentage of its critical areas property that it contends constitute "certain critical areas," I AR at 23, as provided under the Ordinance, and defined under the Critical Areas Amendment (above). TCC 17.15.355(B)(4)(a).

A. Standard of Review
¶ 34 We stand in the same position as the superior court, reviewing de novo the County's adoption of the Critical Areas Amendment, based on the GMH Board's administrative record. See Girton v. City of Seattle, 97 Wash.App. 360, 363, 983 P.2d 1135 (1999), review denied, 140 Wash.2d 1007, 999 P.2d 1259 (2000). Similarly, we review de novo alleged errors of law. Girton, 97 Wash. App. at 363, 983 P.2d 1135. Bayfield carries the burden of proving that the Critical Areas Amendment violates substantive due process, an issue that only the superior court could address. See Christianson v. Snohomish Health Dist., 133 Wash.2d 647, 659, 946 P.2d 768 (1997).[12]

B. Presbytery Three-Prong Test
¶ 35 In Presbytery, the Washington State Supreme Court articulated the following three-prong test for determining whether a regulation violates substantive due process:

*421 To determine whether the regulation violates due process, the court should engage in the classic 3-prong due process test and ask: (1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the land owner. In other words, 1) there must be a public problem or evil, 2) the regulation must tend to solve this problem, and 3) the regulation must not be unduly oppressive upon the person regulated. This third inquiry will usually be the difficult and determinative one.
Presbytery, 114 Wash.2d at 330-31, 787 P.2d 907 (internal citations omitted) (internal quotation marks omitted).
¶ 36 In discussing the test's third prong, the Presbytery court noted that "[t]he `unduly oppressive' inquiry lodges wide discretion in the court and implies a balancing of the public's interest against those of the regulated landowner." 114 Wash.2d at 331, 787 P.2d 907. The court listed the following factors "to consider to assist it in determining whether a regulation is overly oppressive": (1) "the nature of the harm sought to be avoided"; (2) "the availability and effectiveness of less drastic protective measures"; and (3) "the economic loss suffered by the property owner." Presbytery, 114 Wash.2d at 331, 787 P.2d 907. Bayfield's argument focuses on the test's second and third prongs. We address all three in turn.

1. Amendment addresses a public problem.
¶ 37 Contrary to Bayfield's argument, the identified "public problem," Br. of Appellant at 18, was the County's failure to comply with the statutory requirement to "provide for a variety of rural densities" under RCW 36.70A.070(5)(b). I AR at 22. Thus, to the extent that Bayfield's argument relies on its misidentifying the public problem as "developmental impacts to critical areas," Br. of Appellant at 16, its argument fails.[13]

2. Amendment reasonably necessary to provide for a variety of rural densities.
¶ 38 Referring to the Presbytery test's second prong, Bayfield argues that the Critical Areas Amendment is not reasonably necessary to protect critical areas because "prior regulations adequately protected [them]," the Amendment does not "`tend to solve' [the] problem," Br. of Appellant at 15, of "developmental impacts to critical areas," Br. of Appellant at 16, and (3) "`the nature of the harm to be avoided' is virtually nonexistent," Br. of Appellant at 18, where "the County's other critical area regulations protect critical areas from the harm of development." Br. of Appellant at 18. We disagree.
¶ 39 First, Bayfield's argument that the previous development regulations rendered the Amendment unnecessary misinterprets the test's second prong. In determining whether a regulation uses means necessary to achieve its public purpose, "the mere existence of another means does not establish that the means chosen were not reasonably necessary." Christianson, 133 Wash.2d at 664, 946 P.2d 768. As the superior court correctly noted, "The regulation is not required to be the best way to achieve the purpose, but rather, the regulation must be reasonably necessary to achieve the purpose." CP at 195.
¶ 40 Second, contrary to Bayfield's argument, the record demonstrates that the Critical Areas Amendment tends to solve the problem of "provid[ing] for a variety of rural densities." I AR at 22; Burton v. Clark County, 91 Wash.App. 505, 529, note 67, 958 P.2d 343 (1998) (citing Presbytery, 114 Wash.2d at 330, 787 P.2d 907)("[T]he second prong is the same as asking whether governmental conduct tends to solve the identified public problem."). The record shows that in *422 excluding from a property's density calculation "certain critical areas," I AR at 23, which had not been excluded under the previous zoning code, the County necessarily accomplished its goal of varying the density requirements for rural properties. Accordingly, Bayfield fails to meet its burden of showing that the Critical Areas Amendment does not "tend to solve," Br. of Appellant at 18, the public problem of providing for a variety of rural densities as set forth under RCW 36.70A.070(5)(b). Presbytery, 114 Wash.2d at 331, 787 P.2d 907.

3. No showing of undue oppression
¶ 41 Referring to the third prong of the Presbytery test, Bayfield argues that the Critical Areas Amendment is unduly oppressive because (1) "the economic loss to rural property owners is significant"; and (2) the critical areas regulations predating Ordinance No. 13884 "are both available and effective."[14] Br. of Appellant at 18. The record does not support this argument.
¶ 42 As we note above, the Presbytery court explained that (1) "[t]he `unduly oppressive' inquiry lodges wide discretion in the court and implies a balancing of the public's interest against those of the regulated landowner"; and (2) the factors "to assist [a court] in determining whether a regulation is overly oppressive" include "the nature of the harm sought to be avoided," the "availability and effectiveness of less drastic protective measures," and the "economic loss suffered by the property owner." Presbytery, 114 Wash.2d at 331, 787 P.2d 907. Although Bayfield argues that "the economic loss to rural property owners is significant," it provides inadequate evidence or argument to support this assertion.[15] Br. of Appellant at 18. Bayfield's failure to provide sufficient specific information about its property's claimed loss in value and the total area of its property designated as "certain critical areas," I AR at 23, undermines its argument on the test's third prong.
¶ 43 Division One's decision in Jones v. King County is instructive. 74 Wash.App. 467, 874 P.2d 853 (1994). Jones argued that King County's rezone ordinance violated substantive due process and "was unduly oppressive" because it caused substantial and permanent loss to his property's value by preventing him from dividing his property into one-acre lots. Jones, 74 Wash.App. at 480, 874 P.2d 853. Applying Presbytery's third prong and non-exclusive factors, Division One concluded that although the rezone caused "some value loss" to Jones' property, "the amount [could not] be determined from th[e] record" because it contained no information about "how many homes could be built under either zoning classification" or the relative price for which such homes could be sold. Jones, 74 Wash.App. at 481, 874 P.2d 853. The court further noted that the rezone "does not make unfeasible the current use of the property, nor does it eliminate all future development." Jones, 74 Wash.App. at 481-82, 874 P.2d 853.
¶ 44 Applying Division One's analysis here, Bayfield similarly has failed to carry its burden to show that the Amendment unduly oppresses property owners. Even if the Amendment did cause "some loss in value" to its property, Jones, 74 Wash.App. at 481, 874 P.2d 853, which the record fails to show, the record contains no information about whether Bayfield intended to subdivide all or part of its 700-acre property, and Bayfield provides no data analysis of the financial loss it claims to have incurred as a result of the Amendment. Accordingly, we reject Bayfield's *423 argument that the Critical Areas Amendment unduly oppresses property owners in general and it in particular.

II. GMA Goal No. 6
¶ 45 Bayfield next argues that the Board erroneously interpreted and applied GMA Goal No. 6 and failed to base its decision on substantial evidence. The record fails to support this argument as well.

A. Standard of Review
¶ 46 The APA governs judicial review of an administrative hearings board's decision, applying the standards of RCW 34.05.570(3) directly to the agency's record. Motley-Motley, Inc. v. State., 127 Wash.App. 62, 72, 110 P.3d 812 (2005). In reviewing an administrative land use decision, we stand in the same position as the superior court and limit our review to the administrative record before the hearings board. Peste v. Mason County, 133 Wash.App. 456, 466, 136 P.3d 140 (2006). We may grant relief from a land use decision if the party seeking relief establishes one of the standards for reversal, including the hearings board's "erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise," and the board's failure to base its decision on "evidence that is substantial when viewed in light of the whole record." RCW 36.70C.130(1)(b) and (c).

B. GMA Land Use Regulations

1. Planning goals and rural element regulations
¶ 47 The legislature enacted the GMA and its 13 planning goals "to guide the development and adoption of comprehensive plans and development regulations." RCW 36.70A.020. These goals "are not listed in order of priority." RCW 36.70A.020. Goal No. 6, on which Bayfield's argument focuses, provides, "Private property shall not be taken for public use without just compensation having been made," and, "The property rights of landowners shall be protected from arbitrary and discriminatory actions." RCW 36.70A.020(6).
¶ 48 The GMA requires counties to include in their comprehensive plan, rural element "lands that are not designated for urban growth, agriculture, forest, or mineral resources." RCW 36.70A.070(5). The GMA also requires counties to adhere to the following "rural development" regulation at issue here:
The rural element shall permit rural development, forestry, and agriculture in rural areas. The rural element shall provide for a variety of rural densities, uses, essential public facilities, and rural governmental services needed to serve the permitted densities and uses. To achieve a variety of rural densities and uses, counties may provide for clustering, density transfer, design guidelines, conservation easements, and other innovative techniques that will accommodate appropriate rural densities and uses that are not characterized by urban growth and that are consistent with rural character.

RCW 36.70A.070(5)(b) (emphasis added).
¶ 49 The GMA further provides:
The rural element shall include measures that apply to rural development and protect the rural character of the area, as established by the county, by:
(i) Containing or otherwise controlling rural development;
(ii) Assuring visual compatibility of rural development with the surrounding rural area;
(iii) Reducing the inappropriate conversion of undeveloped land into sprawling, low-density development in the rural area; [and]
(iv) Protecting critical areas, as provided in RCW 36.70A.060, and surface water and ground water resources; ...
RCW 36.70A.070(5)(c) (emphasis added).

2. Critical areas regulations
¶ 50 RCW 36.70A.060 provides development regulations to protect natural resource lands and critical areas. RCW 36.70A.060(2) requires counties to "adopt development regulations that protect critical areas that are required to be designated under RCW 36.70A.170." The statute defines "critical areas" *424 as "areas and ecosystems," including wetlands, areas with a critical recharging effect on aquifers used for potable water, fish and wildlife habitat conservation areas, frequently flooded areas, and geologically hazardous areas. RCW 36.70A.030(5). Chapter 17.15 of the TCC governs critical areas. The County's policy goals for critical areas include: "protect[ing] the public from natural hazards," "protect[ing] unique, fragile, and vulnerable elements of the environment," "alert[ing] the public of these critical areas," "avoid[ing] public subsidy of private development impacts," "assist[ing] property owners in developing their property by promoting innovative land use techniques," "implement[ing] the policies and guidelines of the Washington State Growth Management Act and ... the goals and policies of the Thurston County Comprehensive Plan." TCC 17.15.100.

C. County's Application of GMA Goal No. 6
¶ 51 Bayfield argues that the GMH Board erroneously interpreted and applied GMA Goal No. 6, more specifically, that the GMH Board erred in concluding that a property owner's right to subdivide "is not a legally recognized right" because "[t]he right to subdivide property free from unreasonable regulation is a right protected by the constitution and, therefore, is a right within the scope of the GMA's Goal 6." Br. of Appellant at 26. Reviewing the GMH Board's challenged legal conclusions de novo, we reject Bayfield's argument.
¶ 52 Contrary to Bayfield's argument, the Critical Areas Amendment's subtracting "certain critical areas," I AR at 23, from the density calculation for Rural Residential and Rural Residential Resource districts does not categorically prevent a property owner from subdividing or selling properties in these areas. As we note above, Bayfield provides no information about its specific plans, if any, to subdivide or to sell its property; nor does it detail how the County's restrictions prevent a reasonable economic use of the land. In addition, the record fails to support Bayfield's argument that it has a legally recognized right to subdivide its property. At the hearing on Bayfield's petition for review, the GMH Board asked Bayfield if it "claim[ed] to have a property right to be able to develop the property at it's [sic] current zoning," and Bayfield responded, "No." AT at 85. Furthermore, the County represented to the GMH Board that a property owner would still be able to build a house on a parcel containing 65 percent critical areas. Thus, because Bayfield fails to show both that the Critical Areas Amendment prevents it from subdividing its property and that it has a legally recognized right to subdivide its property, it fails to show that the GMH Board erroneously interpreted and applied the law.

D. Substantial Evidence Supports GMH Board's Decision
¶ 53 Bayfield next argues, "No evidence supports the [GMH Board's] assertion regarding an owner's `reasonable expectation of developing [the] property,'" Br. of Appellant at 28 (quoting FF 11); and, "[t]he [] Board cite[d] no evidence to support its findings that the County's approach provides additional open space, reduces impervious surface, conserves fish and wildlife habitat, and provides additional environmental protection[s]." Br. of Appellant at 29. These arguments also fail.
¶ 54 To succeed on this claim, Bayfield must show that the evidence supporting the Board's decision is not substantial when viewed in light of the whole record before the GMH Board. RCW 36.70C.130(1)(b-c); see Peste, 133 Wash.App. at 466, 136 P.3d 140. Substantial evidence is evidence sufficient to persuade an unprejudiced, rational person that a finding is true. Isla Verde Int'l Holdings, Inc. v. City of Camas, 146 Wash.2d 740, 751-52, 49 P.3d 867 (2002). This deferential standard requires reviewing courts to consider all the evidence and reasonable inferences in the light most favorable to the prevailing party in the highest fact-finding forum, here, the GMH Board. Freeburg v. City of Seattle, 71 Wash.App. 367, 371-72, 859 P.2d 610 (1993).
¶ 55 In rejecting Bayfield's argument that the Critical Areas Amendment is arbitrary and discriminatory, the GMH Board concluded that (1) the County adopted the Amendment on a rational basis because the "County's approach provides additional open space[,] [reduces] impervious surfaces, ... conserves [fish and] wildlife habitat, ... and *425 provides additional environmental protection[s]"; and (2) "the County took into consideration that the deducted portion was unbuildable land which a property owner would not have [a] reasonable expectation of developing." CP at 39. The record supports this conclusion. As we note above, at the GMH Board hearing, Bayfield did not claim "to have a property right to be able to develop the property at it's [sic] current zoning," AT at 85; nor did Bayfield object to the County's affirmative response to the GMH Board's question about whether a property owner would still be able to build a house on parcel containing "65 percent critical areas." AT at 84. Similarly, the record demonstrates that when the GMH Board asked the County whether it "would [ ] be fair" to refer to critical areas property as "unbuildable lands," the County agreed, "That's fair." AT at 85. Bayfield neither objected to this statement nor provided a counterargument on this point.
¶ 56 The record also demonstrates that (1) in identifying lands to rezone, the County included in its criteria lands physically constrained or hazardous to develop and lands of high habitat or environmental value; (2) the public workshop groups prioritized the lands for rezone as those consisting of unbuildable lands, hazardous lands, wetlands, sensitive areas, and conservation areas; (3) the County Planning Commission found that the Innovative Technique decreases "density in areas near sensitive critical areas," III AR at 1016, and provides an "innovative way to effectively achieve a variety of rural densities," III AR at 1016; and (4) the Critical Areas Amendment provided that its rezone provisions "will reduce development in environmentally sensitive and hazardous areas ... thereby helping to protect public health, safety and welfare." I AR at 23. As the GMA requires, the Critical Areas Amendment reduces rural density by restricting building development in rural lands, consequently protecting a larger area of rural land from the impacts of building development.[16] These facts support the GMH Board's finding that the County implemented the Critical Areas Amendment on a rational basis.
¶ 57 The foregoing evidence is sufficient to persuade an unprejudiced, rational person that the GMH Board appropriately determined that the Critical Areas Amendment provides additional environmental protections and that "the County took into consideration that the deducted portion was unbuildable land which a property owner would not have any reasonable expectation of developing." CP at 39. Viewing the evidence in the light most favorable to the County and reviewing it against the entire record before the GMH Board, we hold that substantial evidence supports the Board's finding of fact no. 11 and its denial of Bayfield's petition for review.
¶ 58 We affirm the superior court's denial of Bayfield's substantive due process claim, and we affirm the GMH Board's denial of Bayfield's petition to invalidate the County zoning code's Critical Areas Amendment.
We concur: BRIDGEWATER, P.J., and VAN DEREN, J.
NOTES
[1] In Bayfield's notice of appeal, it also appeals the trial court's denial of its motion for reconsideration. See Clerk's Papers (CP) at 188. But because Bayfield does not include this issue in its Brief of Appellant, this opinion does not further address it. See RAP 10.3(a)(5) (requiring parties to provide argument in support of the issues presented for review, together with citations to legal authority and references to the relevant parts of the record).
[2] The TCC provides, "Each planned rural residential development shall contain a resource use parcel." TCC 20.30A.040(1). Subject to any land use limitations in the underlying district, the resource use parcel's "[p]ermitted uses" include "[n]atural areas including, but not limited to, critical areas and associated buffers, and wildlife corridors." TCC 20.30A.040(3)(a)(iii).
[3] RCW 36.70A.070(5)(b) provides, "The rural element shall provide for a variety of rural densities, uses, essential public facilities, and rural governmental services needed to serve the permitted densities and uses."
[4] The County Code defines "[d]welling unit" as "one or more rooms in a residential building or residential portion of a building which are arranged, designed, used or intended for use as a complete, independent living facility for one family, and which includes permanent provision for living, sleeping, eating, cooking and sanitation." TCC 20.03.040(43).
[5] Bayfield imprecisely challenged the Ordinance's "Critical Area Amendment," without specifying whether this challenge applied to the Ordinance's amendments to Chapter 17.15 TCC in whole or in part.
[6] "CAIT" refers to the "Critical Areas Innovative Technique." CP at 34.
[7] In its subsequent decision by letter, the superior court noted that RCW 34.05.534 excuses a petitioner's failure to exhaust a claim that would be futile. It also noted that although it "[wa]s not convinced that the APA allows the issue to be raised for the first time" in superior court, "[e]ven if the argument were to be allowed, ... the County's adoption of the [Critical Areas] Amendment[] did not violate due process." CP at 195.
[8] Although we review the GMH Board's decision directly, based on the administrative record before the GMH Board, due process is an issue that the parties could not raise before the GMH Board. See Honesty in Envtl. Analysis & Legislation (HEAL) v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 96 Wash.App. 522, 527, 979 P.2d 864 (1999) (RCW 36.70A.280 grants GMA hearings boards "specific jurisdiction to hear and determine only those petitions alleging that a governmental agency is not in compliance with the [GMA's] requirements."). Thus, Bayfield properly raised its due process challenge in the superior court, sitting in its appellate capacity. We review the superior court's due process ruling de novo. Federal Way School Dist. No. 210 v. State, 167 Wash.2d 514, 523, 219 P.3d 941 (2009) ("Interpretation of the [C]onstitution is a question of law, which we review de novo.").
[9] As we note above, Bayfield imprecisely characterizes the portion of the Ordinance it seeks to invalidate as "the Critical Area Amendment," Br. of Appellant at 13, without specifying whether this characterization applies to the Ordinance's amendment to Chapter 17.15 TCC in its entirety or in part. Because Bayfield's argument centers on the Ordinance's requirement to subtract certain "critical areas," I AR at 22, from the density calculation, we assume that Bayfield's argument challenges only the provision of the Critical Area Amendment requiring "certain critical areas," I AR at 23, to be excluded from the density calculation, namely subsection 17.15.355(B)(4)(a) of the amended code, as adopted under Ordinance No. 13884 ¶ 21.
[10] We also reject Bayfield's ancillary argument, based on HEAL, that the superior court erred in failing to address Bayfield's assertion that "the GMA requires the County to base its critical area protections on the best available science." Br. of Appellant at 20. As GMA Board noted below, HEAL does not support Bayfield's proposition; instead, it provides that although the GMA creates a procedural requirement for the best available science to be included on the record, it "require[s][no] particular substantive outcome or product." HEAL, 96 Wash.App. at 531, 979 P.2d 864.

Here, unlike in HEAL, the County zoning code's Critical Areas Amendment is a density regulation; and although it does apply to Critical Areas, in addition to other zoning designations, it does not clarify, amend, or otherwise implicate its previously codified and unchallenged Critical Areas policies. Because HEAL does not support Bayfield's argument on this issue, we do not consider the Company's related argument, in footnote no. 5 of its Brief of Appellant that the superior court erred in rejecting this argument on other grounds. See Br. of Appellant at 21.
[11] RCW 36.70A.030(15) defines "rural character" as follows:

"Rural character" refers to the patterns of land use and development established by a county in the rural element of its comprehensive plan:
(a) In which open space, the natural landscape, and vegetation predominate over the built environment;
(b) That foster traditional rural lifestyles, rural-based economies, and opportunities to both live and work in rural areas;
(c) That provide visual landscapes that are traditionally found in rural areas and communities;
(d) That are compatible with the use of the land by wildlife and for fish and wildlife habitat;
(e) That reduce the inappropriate conversion of undeveloped land into sprawling, low-density development;
(f) That generally do not require the extension of urban governmental services; and
(g) That are consistent with the protection of natural surface water flows and ground water and surface water recharge and discharge areas.
[12] "Clear authority provides that in a substantive due process challenge the person challenging the regulation has the burden of proof." Christianson, 133 Wash.2d at 659, 661, 946 P.2d 768 (holding that a party challenging a county resolution as applied to his or her property has the burden of proving that the resolution violates substantive due process).
[13] Alternatively, Bayfield argues that language in the Critical Areas Agreement "refutes" that failure to provide a variety of rural densities is the "public problem." Br. of Appellant at 21. Bayfield's argument overlooks that (1) the GMH Board identified a "public problem" when it found Thurston County had failed to establish a variety of rural densities as required by law, CP at 104; (2) the Amendment's language encompasses the public problem by expanding the variety of rural densities; and (3) the Amendment's language was also shaped by extensive public input about how best to comply with the GMA.
[14] The County asserts that the Critical Areas Amendment is not unduly oppressive because (1) it applies only "to unbuildable land in the County's highest rural zoning districts," Br. of Resp't at 17, and the "public picked unbuildable lands as the most obvious areas to rezone"; (2) it provides "the least restrictive way to provide a variety of densities"; and (3) it "will not alter the planned use of the property" because property owners can still "develop the buildable portions of the property, just with less density." Br. of Resp't at 18.
[15] For example, Bayfield provides no cost estimate of the purported "economic loss to rural property owners," Br. of Appellant at 18, or to itself, nor does it support its argument that subtracting certain critical areas from a rural property's density calculation causes the property to lose value and/or creates a tangible economic burden or loss related to the property's potential for development.
[16] More specifically, because the Critical Areas Amendment subtracts "certain critical areas," I AR at 23, from the rural residential district's density calculation, it reduces the number of permitted dwelling units, thus, decreasing the total building density in that district.